Henry STELLER and Lena Steller, Respondents,

v.

John R. STELLER and Elizabeth Steller, Appellants.

No. 51290.

Supreme Court of Missouri, Division No. 2.

April 11, 1966.

Bild & Cooper, Frank Bild, St. Louis, for plaintiffs-respondents.

Goldenhersh, Gallagher, Fredericks & Newman and Leo M. Newman, St. Louis, for defendants-appellants.

EAGER, Presiding Judge.

This is a suit to set aside a warranty deed alleged to have been executed by reason of coercion and undue influence exercised by the appellants. We shall refer to the parties as they appeared below. Henry Steller, one of the plaintiffs, is a brother of John Steller, one of the defendants. Both were "distant" cousins of the grantor Eva Wlcek. The real estate involved was a comparatively small residence in St. Louis County; the deed was dated May 15, 1958, and it was recorded on February 28, 1961, after the grantor's death. By answer, the defendants denied all substantive allegations, and alleged that the deed was executed in consideration of love and affection and nursing care. Eva's executor was originally a party plaintiff, but he voluntarily dismissed his claim prior to trial. The trial court made detailed findings of fact in favor of plaintiffs; most of those matters will be covered in our recital of the evidence. The court also concluded that the deed was executed as a result of defendants' undue influence, and that the evidence was "clear, cogent and convincing"; the deed was adjudged to be void and title was vested one-half in plaintiffs and one-half in defendants, as provided in Eva's will. After-trial motions were overruled by the lapse of time, and this appeal was duly taken.

On this appeal defendants assert: that no confidential relationship was proven, that no presumption of undue influence arose, and that plaintiffs failed to prove, to the degree required, that the will and free agency of the grantor was destroyed and replaced by the will of the defendants at the time of the execution of the deed. All the evidence was produced by the plaintiffs, and defendants stood upon their motion to dismiss.

At the time of Eva's death in February 1961, she was seventy-nine years old. She and her husband, Mihal (Mike) Wlcek, had lived for some years at 5351 Lode Avenue in St. Louis County, that being the property now in controversy. It seems that they had

one child, who had died many years ago. In the fall of 1957 Eva had deteriorated until she was markedly senile; physically, she had a number of "small strokes," a severe heart condition and arteriosclerosis; mentally she had "slowed down," had memory lapses, and was lucid at times but confused at others. In September 1957, she became a patient in Miller's Nursing Home. Her husband died in October while she was there. She was taken to the funeral home, but was unable to attend his funeral. Dr. Wilucki, who had been her physician for about five years, attended her several times (four to six) in the nursing home. He testified: that she could answer simple questions but could not carry on any substantial conversations, was never "real clear," was depressed, and was kept on tranquilizers; she sometimes recognized people, and at other times she did not. He last saw her shortly before Christmas, and was never called to see her later at defendants' home. It was his opinion that her senility would continue to go "downhill," with periods of increasing and slowing down, but that "as a general rule" her condition would have been worse in May 1958 (five months later) than when he last saw her. Just before Christmas, 1957, the doctor, on request from the hospital, released Eva to go home for the holidays. The defendants took her to their apartment, as we shall note later.

While Eva was in the nursing home, and on October 18, 1957, she executed a power of attorney to Lena, authorizing her to handle Eva's affairs. These were not complicated, and Lena continued to attend to these matters until Eva's death, and apparently without complaint from anyone. The power of attorney was apparently suggested by officials of the nursing home, and not by Lena; she testified that she talked to a lawyer about the matter and later received the executed power by mail. Eva had previously said that she "should take care of her business,"—everything. Henry and John, through their mother, were Eva's cousins. Lena had known Eva for about 38 years; she had visited Eva occasionally in her home, and later saw her approximately two or three times a week in the nursing home. During October 1957, Eva discussed with Lena the making of a will on two different occasions, telling her what she wanted in the will, namely, a bequest of $200 to the Salem Lutheran Church and the residue to be divided equally between John and Henry, with Henry and Lena to "take care of everything." Lena spoke to the officials of the home, and they advised her to go ahead with that request. Lena testified that at the time of the discussion concerning the power of attorney Eva knew what she was doing, and at the time of the discussions of her will she knew her relatives and knew of her ownership of a home. Lena procured the services of an attorney and a will was drawn and executed in accordance with Eva's expressed desires. Lena was not present at its execution. She told John and Betty of the power of attorney and of the execution of the will. There were times when Lena could not understand Eva in the nursing home, because her words were "not plain," but she did not "ramble." Lena was a receptionist for Dr. Wilucki, who was a witness.

As indicated, the defendants took Eva to their three-room upstairs apartment for Christmas of 1957. They continued to keep her and, early in January 1958, the plaintiffs and defendants met in that apartment to arrange for Eva's future care. The defendants suggested moving with Eva into her own home on Lode Avenue; it was agreed that defendants would continue to care for her but would move with her to that home (the property in controversy here), would receive her social security check of about $69.80 and $100 a month from Eva's funds, but would pay a monthly rent of $25. These arrangements were entirely satisfactory to John and Betty, but no one told Eva of them. She was moved by ambulance to her home in February 1958, and, with the exception of about two weeks in a hospital near the end of her life, lived there with John and Betty until her

death in February 1961. Under the arrangement as made, defendants were to pay all household expenses and all cost of Eva's care, including medicine and doctors' bills, but excluding hospital costs. Soon after this arrangement was made, Lena and John opened Eva's safe deposit box and found a certificate of deposit for an amount slightly more than $2,500; John took this, and he later said that he had placed $1,000 in his bank to cover Eva's funeral expenses, but he obviously kept the remainder; at the time he said, "Aunt Eva is with us, we may as well take it home." Apparently John and his wife gave Eva credits of $100 per month until the $1,500 was exhausted; after that Lena paid them monthly out of Eva's funds; she also received the rent payments. John presented to Lena the real estate tax statements for 1958, 1959, and 1960, and she paid them from Eva's funds. She also paid a bill for plumbing repairs, submitted to her by John, the work being done by John's son-in-law.

On one occasion when Lena saw Eva in early January 1958, at defendants' apartment, Eva had been crying and was crying; when Lena asked her what was wrong, she said that John "wanted her to change her will." Lena said that she would talk to John but Eva protested; nevertheless, Eva called John into the bedroom, asked him if that was true, and the only reply she got was "well." Lena then suggested to Eva that she leave things even between John and Henry, "as is."

Lena frequently visited Eva; she was generally in bed, but during the spring she was sometimes sitting up; in fact, she apparently improved physically, but not mentally. She sometimes sat in a wheelchair, and occasionally walked a little with assistance. She knew Lena and became upset when Lena did not visit her frequently. Both John and Henry were retired, and Lena was the only one of the four who was holding a job. Henry seldom visited Eva, as he was afflicted with rather serious arthritis during much of this time. When Eva complained that she signed her social security checks but got no proceeds, Lena explained that the money went to Betty for taking care of her. On one occasion in late 1958 or early 1959 Betty told Lena that every time she came to see Eva the latter seemed more "upset afterwards," and that maybe it would be better if she did not come every week. Thereafter, Lena skipped a week, but when she came back Eva complained bitterly, so she resumed her regular visits. From late 1958 Eva continually asked Lena whether she should sell her house and go back into a nursing home; she had never said anything to Lena about having deeded her property away. At one time Lena suggested to Betty that they should tell Eva what she was paying for their care, because Eva seemed to feel that she "was in the way," but Betty said "no." In late 1959 or early 1960 Eva was frequently crying and dissatisfied and talked about going back into a home; Lena told Betty and John of this, and John immediately went in and said to Eva in German: "What's the matter? Don't you like it here; aren't we good to you." Eva replied "all right, all right."

Eva owned a 1951 Mercury car which was kept at the home. In the spring of 1958 one Tony Golaszewski called on her, wanted to buy the car and offered her $400; John took the man out to inspect it. John said that he was going to buy it, and Eva told the man to come back the next day; he did so, but was told by Betty that the car had been sold and, on inquiring of Eva, she confirmed it. It developed that the title was transferred to John and Betty for $200, for which amount John delivered a check to Lena. A reproduction of the application for the change of title was produced and identified; Lena testified that the signature on the application was not Eva's.

An old friend of Eva's, Carrie Steck, visited her both in the nursing home and at the Lode Avenue address, more fre-

quently at the latter place. They talked in German. About May 1958, she told Mrs. Steck that she was not happy there and asked if she should go back to the nursing home. Mrs. Steck told Betty of this, and Betty said that if she "didn't like it John would put her in her place." Eva often cried; she didn't like the meals and did not like the late hours of arising and having her breakfast. Mrs. Steck thought that Eva's speech had improved somewhat. John was always at home and could hear everything that was said; Eva said, on one occasion, "Nix so loud if they would hear me they would scold." About May or June 1958, Mrs. Steck felt that she was no longer being welcomed by Betty and John and she quit going to visit.

The insurance on the house was carried in a three-year policy expiring in September 1960; after Mihal's death the policy was endorsed to Eva only. That ownership was never changed by endorsement thereafter, and the policy expired at its termination date; the agent was not notified of any change of ownership. The deed in question here was a general warranty deed dated May 15, 1958; it was not recorded until February 28, 1961, about two weeks after Eva's death. Neither John nor Betty had ever mentioned the deed to either of the plaintiffs prior to Eva's death. On February 28, 1961, John, after consulting an attorney, procured an order from the Probate Court refusing letters of administration, upon the filing of an affidavit; in that proceeding John claimed to be entitled to reimbursement for the funeral bill of $1,152.98, and the order listed as assets a checking account of $605.15. After a controversy had arisen, Henry, as executor, filed and probated the will and he also instituted proceedings against these defendants for the discovery of assets. In answer to those interrogatories, John and Betty stated that they had in their possession the various personal property, including appliances, furniture, clothing, etc., but that in February 1958, Eva had given it all to them in consideration of her care

and maintenance. The court ordered the property turned over to the executor; it was later sold for a more or less nominal sum. John was allowed $133 for his payment on the funeral expenses, and certain other reimbursements.

In early March 1961, the plaintiffs and defendants had met to discuss the payment of the expenses of Eva. John had called and said that he had seen a lawyer and that he could get the money out of the bank. When they met, John said to Lena: "I think you are going to be in for a shock * * * we bought the place for a dollar." This was the first inkling on the part of Lena and Henry that the property had been transferred. Lena replied: "John, you couldn't." He said, "I did," and that there was nothing that could be done about it. After that, no agreement was reached on anything and this suit was instituted a little later.

■ The equitable principles governing cases of this sort have been declared many times. The difficulty lies in fitting each case, with its own individual facts, into those principles. Since cancellation is an extraordinary function of equity, it is said that the evidence to justify it must be clear, cogent and convincing. Hamilton v. Steininger, 350 Mo. 698, 168 S.W.2d 59; McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698; Lastofka v. Lastofka, 339 Mo. 770, 99 S.W.2d 46. Undue influence, such as invalidates a deed, must consist of overpersuasion or coercion which substitutes the will of one person for the free will of the other. Horn v. Owens, Mo., 171 S.W.2d 585; Sebree v. Rosen, Mo., 349 S.W.2d 865; Houghton v. West, Mo., 305 S.W.2d 407; Peine v. Sater, Mo., 289 S.W.2d 101. A mere suspicion of undue influence or the opportunity of a defendant to have exerted such influence, is not sufficient. Lastofka v. Lastofka, supra; Hamilton v. Steininger, supra; Flynn v. Union National Bank of Springfield, Mo.App., 378 S.W.2d 1. But, on the other hand, proof of undue influence does not require direct and positive

evidence of the words or acts which constitute it, but it may be inferred from all the facts and circumstances. Loehr v. Starke, Banc, 332 Mo. 131, 56 S.W.2d 772; Sebree v. Rosen, Mo., 349 S.W.2d 865; Mowry v. Norman, 204 Mo. 173, 103 S.W. 15; Peine v. Sater, Mo., 289 S.W.2d 101; Coldwell v. Coldwell, Mo., 228 S.W. 95; Lastofka v. Lastofka, 339 Mo. 770, 99 S.W.2d 46; and, it is not necessary that there should be specific evidence that the defendant's influence was being exerted at the precise time of the execution of the deed or will,—or, in other words, evidence of an overt act at that time. Houghton v. West, Mo., 305 S.W.2d 407; Mowry v. Norman, 204 Mo. 173, 103 S.W. 15; Phelan v. Gockel, Mo., 278 S.W.2d 758; Cook v. Higgins, 290 Mo. 402, 235 S.W. 807; Dimity v. Dimity, Mo., 62 S.W.2d 859.

■ We are urged by plaintiffs to hold that a confidential relationship existed between Eva and her cousins John and Betty. That is said to be a relationship of special trust and reliance, which also involves some fiduciary obligation. Walton v. Van Camp, Mo., 283 S.W.2d 493; and see the discussion and cases cited in Flynn v. Union National Bank of Springfield, Mo. App., 378 S.W.2d 1. Plaintiffs say that such a relationship was created when Eva's bodily custody was turned over to defendants. We do not so hold, but it is obvious that this fact is one highly material to our consideration of undue influence, generally. Dimity v. Dimity, Mo., 62 S. W.2d 859; Patton v. Shelton, 328 Mo. 631, 40 S.W.2d 706. Even where the existence of a confidential relationship is found, all the recent cases hold that there must also be evidence of facts and circumstances tending to show undue influence before a presumption of undue influence arises. McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698; Flynn v. Union National Bank of Springfield, supra; Lastofka v. Lastofka, 339 Mo. 770, 99 S.W.2d 46; Loehr v. Starke, Banc, 332 Mo. 131, 56 S.W.2d 772; Walton v. Van Camp, Mo., 283 S.W.2d 493.

The plaintiffs did not allege mental incapacity, as such, as a ground for the cancellation and, of course, the trial court found none. We do not find that the evidence here would have been sufficient for a cancellation upon that ground, but Eva's rather marked mental weakness (as well as her physical condition) was certainly a matter for consideration upon the claim of undue influence, for such a person is naturally more susceptible to influence, good or bad. In fact, it has been said that mental weakness and undue influence are "somewhat intertwined." Flynn v. Union National Bank of Springfield, supra. See also Wilhoit v. Fite, Mo., 341 S.W.2d 806; Houghton v. West, Mo., 305 S.W.2d 407; Patton v. Shelton, 328 Mo. 631, 40 S.W.2d 706; Colquitt v. Lowe, Mo., 184 S.W.2d 420. From the evidence it clearly appears that Eva was markedly senile, that at times her conversation was clear, at times it was not, that at times she was confused, and that the doctor thought she never was "real clear" at any time. She did know who her relatives were and recognized them. Added to all this was her extreme physical weakness and deterioration,—the combined result of strokes, her "severe" heart condition, and the usual deteriorating effects of arteriosclerosis. She was in bed most of the time and apparently got up only with assistance. She was thus wholly dependent physically upon those who were taking care of her, and certainly was more inclined to be subservient to them mentally.

■ We conclude that there is "clear, cogent, and convincing" evidence here from which we may and do reasonably infer that the deed was procured by and through the undue and coercive influence of the defendants. In this we are particularly moved by the following facts: that defendants originally suggested taking Eva from the nursing home and they volunteered to keep her, after first asking permission to take her for the "holidays"; that soon after thus taking her to their home, John wanted her to change her

will, and made no denial when confronted with that fact; that defendants also suggested (which may have been entirely proper) moving into Eva's house on Lode Avenue; that her original physician was never called back, he being the employer of Lena; that the relationship was such that Eva was afraid of being overheard and scolded by defendants; that John did scold her about her complaints, and that Betty told Mrs. Steck that "if she [Eva] didn't like it John would put her in her place"; that Betty made this old friend Mrs. Steck so uncomfortable about visiting Eva that she quit coming, and that she suggested to Lena that she should not come every week; that Eva was paying from her own funds the full amount suggested by Betty for her care and maintenance; that after going to live with John and Betty she saw practically no one else but Lena, Mrs. Steck and very occasionally Henry, and she was thus constantly in the presence and company of both Betty and John; that something caused her to decline a sale of her car for $400 and to sell it to John for $200, although we regard this as not too strong a circumstance; that the deed recited one dollar as its sole consideration, although John claimed to have purchased the property; that the circumstances of the execution of the deed are wholly unknown; that for a period of almost three years from the date of the deed to Eva's death, neither John nor Betty made any mention whatever of it, but continued for all purposes to act on the theory that the property belonged to Eva, and caused her to pay the taxes and pay for repairs; that after Eva's death John and Betty claimed to own all her tangible personal property but were required by the Probate Court to turn it over to the executor; that John procured a refusal of letters, apparently upon a claim that he had paid all the funeral expenses, whereas all but a minor part had been paid with Eva's own money; that after the death John brazenly told Lena that she was going to be "in for a shock" and disclosed his

supposed purchase, telling her further that he "bought the place" because Eva always said she wanted to "sell" it; that Eva obviously did not realize that she had conveyed the property, because during most of the remainder of her life she continued to ask whether she should sell her house and go back into a nursing home.

While it is relatively unimportant here, the recital of a sole consideration of one dollar in a deed purporting to represent a purchase, is a factor "to be considered in connection with the presence of other inequitable incidents." Meyer v. Schaub, 364 Mo. 711, 266 S.W.2d 620; Frey v. Onstott, 357 Mo. 721, 210 S.W.2d 87. The essential fact in this connection is that defendants *did not buy* the property, and that Eva was paying to the defendants what they themselves had fixed as a fair price for her care. This lack of consideration is a material factor.

In Houghton v. West, Mo., 305 S.W.2d 407, Coldwell v. Coldwell, Mo., 228 S.W. 95, and Wilhoit v. Fite, Mo., 341 S.W.2d 806, concealment is considered as one of the usual elements of undue influence. The execution of this deed was most assiduously and effectively concealed, even by implied misrepresentations concerning Eva's liability for taxes and repairs. We have considered certain evidence of facts occurring after the execution of the deed; appellants insist that we may not do so. It is clear that evidence of such facts and circumstances is admissible and may be considered when it is relevant as tending to show the existence of a plan to obtain title to decedent's property and assets. Wilhoit v. Fite, Mo., 341 S.W.2d 806.

The trial court heard the witnesses; it obviously believed them. Its view of the evidence is entitled to deference. However, we independently find and conclude that the execution of the deed in question was

procured through and by undue influence exerted and practiced upon the grantor by these defendants, and that it should be set aside and cancelled. The judgment of the trial court is affirmed.

All of the Judges concur.