J. H. GODSY, Plaintiff-Respondent,

v.

Gladys GODSY, Executrix of the Estate of Alta Godsy, Deceased, Defendant-Appellant.

No. 9388.

Missouri Court of Appeals, Springfield District.

Nov. 27, 1973.

Motion for Rehearing or Transfer Denied Dec. 18, 1973.

Application to Transfer Denied Feb. 11, 1974.

Richard D. Moore, John C. Holstein, Moore & Brill, West Plains, for defendant-appellant.

Esco V. Kell, Harold Henry, West Plains, Jack L. Simms, Jones & McDaniel, Kansas City, for plaintiff-respondent.

KEET, Special Judge.

This is an appeal from judgment in a discovery of assets proceeding under § 473.340 et seq., RSMo 1969, V.A.M.S.,[1] against Gladys Godsy, executrix of the estate of Alta Godsy, initiated by J. H. Godsy, brother of the decedent. Following disqualification of the probate judge under § 472.060 RSMo 1969, V.A.M.S., the case was certified to the circuit court and tried without jury.[2] It ordered defendant to deliver to the estate's personal representative all of the assets in issue, i. e., four bank certificates of deposit, a bank checking account and two promissory notes.

The trial court made the following findings of fact and conclusions of law: 1) the said assets were originally the sole property of decedent; 2) a confidential relationship existed between decedent and de-

1. Compare Laws 1973, Act 75, p. 121; Senate Bill 210, clarifying this procedure.

2. Cf. In re Estate of James, 459 S.W.2d 536 (Mo.App.1970).

fendant during the period the gifts were made by decedent to defendant; 3) such gifts were presumptively void because of undue influence; 4) defendant failed to sustain the burden of proof that the gifts were "entirely free from the taint of undue influence." In re Patterson's Estate, 348 S.W.2d 6, 10 [5] (Mo.1961).

■ Defendant's only points relied on are that the evidence was insufficient to show that defendant was in a position of trust and confidence or that she acted in any way to cause or aid in the transfer of assets. Defendant does not contend that judgment should be reversed because the trial court erroneously placed on her the burden of proof. We shall deal only with defendant's contentions noted above. Even if based on an incorrect theory, the judgment of the trial court should be affirmed if, on the evidence, such a result could properly have been reached. State v. Gomer, 340 Mo. 107, 122, 101 S.W.2d 57, 67[23] (1936); Cook v. Camp, 499 S.W.2d 217 (Mo. App.1973). In our review of this case we follow the principles noted in In re Estate of Hitchcock, 483 S.W.2d 617 (Mo.App. 1972), and Atherton v. Atherton, 480 S.W. 2d 513 (Mo.App.1972). The evidence warrants a finding of the facts we mention.

Alta, a spinster, worked in Kansas City for about 30 years, returning to Howell County in 1950 or 1951. She lived on a farm with her brother Joe, acquiring title to it after he died in 1959 leaving his estate, by will, to his brothers and sisters. A stubborn, strong willed and independent type of person, Alta liked living by herself. In October 1962, at about age 80, Alta got lost on her farm. Searchers found her two days later; she was shoeless, tired and did not have much to say. She was taken to the home of her brother Hiram and his wife Gladys, the defendant, where she stayed for 10 or 12 days. During that time Hiram and Gladys told Alta they might have officers come to get her if she did not do what they wanted. She was afraid they were going to come after her. On October 23, 1962, Hiram went to plain-

tiff's home, wanting plaintiff "to go help him with" Alta. Hiram said they could not do anything with Alta and that she wanted to go home. Plaintiff took Alta to his home where she again evinced fear that officers might come to get her.

The decedent remained at plaintiff's residence until January 27, 1963. She made frequent visits to her farm, accompanied by plaintiff and his wife. The last time they took her there were padlocks on the gate and house door; Alta said, "I have a notion to burn the thing down." On January 27, 1963, Alta placed her dirty clothes in the stool and, not dressed for the cold weather, started walking off. Plaintiff took decedent to the home of her niece. She stayed a short time, then moved to the Hiram Godsy residence. Except for several short periods of hospitalization and occasional visits at the home of her niece, she remained with Hiram and Gladys until her death on February 4, 1966.

In 1961 Alta had made a will similar to that of her brother Joe, leaving her estate to her heirs. She had frequently indicated that she wanted a will just like his. In October 1962 the decedent asked to see her lawyer, A. W. Landis, about her will, because she thought someone might be "messing" with it. On October 27, 1962, she made a new will, which, as Mr. Landis explained to her, would omit "anyone that tries to mess with the will in any way". In March 1963 the defendant asked Mr. Landis for a copy of Alta's will; he refused, but sent a copy to Alta to give the defendant if she wished. Subsequently, on April 29, 1963, Alta executed a new will, making nominal gifts to her other heirs and leaving the remainder to her brother Hiram "in reward for his kindness and care given me during my lifetime" and appointing the defendant as executrix to serve without bond.

In April 1961 decedent gave a written general power of attorney to Hiram and Gladys Godsy. There was evidence that decedent had wanted to buy some addition·

al property but was prevented from doing so by defendant and her husband. In May 1962 Alta's farm was sold to Hiram and Gladys Godsy's daughter and her husband. The terms of purchase included a down payment of unknown amount and a note for $14,150 secured by deed of trust payable at the monthly rate of $50 plus interest. On the note were inked the words: "deposit to Gladys Godsy". The defendant regularly collected on the note. There was an additional note executed on October 5, 1959, in the original sum of $6,800, payable to decedent at the rate of $60 per month. Defendant contends that decedent "signed" the notes to Gladys and Hiram "on the day they were made or shortly thereafter". Additionally, decedent possessed bank certificates .of deposit, those at issue being: #599 for $10,000 on May 14, 1963, payable to Alta or Hiram or Gladys; #672 for $5,000 for February 1, 1964, payable to Alta or Gladys; #726 for $1,500 on August 6, 1964, payable to Alta or Hiram or Gladys; and #773 for $3,200 on January 15, 1965, payable to Alta or Gladys. Defendant's husband, Hiram Godsy, had died October 16, 1964. Other members of decedent's family were not told about the transfer of the bank certificates, the notes, the bank account or the terms of the new will naming defendant as executrix.

In July and August of 1963 decedent was seen by Dr. Amos L. Coffee, who had examined her after she got lost on her farm in 1962. She suffered cardiovascular disease with its attending decreased circulation, a heart problem, auricular fibrillation, feet swelling, and a urinary tract infection. On returning from hospitalization in November 1964, decedent exhibited extreme reluctance to resume residence in defendant's home, and defendant required assistance in getting her into the house. Decedent had developed senility and, according to Dr. Coffee, was severely debilitated by November 1965. He expressed no opinion as to whether the arteriosclerosis had for some time been affecting her brain, but recognized that such was possible.

For the final two or three years of decedent's life she was in close association with and under the care of defendant. Defendant took her places and managed her money affairs. Plaintiff's wife and other members of the family occasionally visited decedent at the defendant's residence, noting that defendant's constant presence restricted the conversation. Visitors noticed that decedent was not her usual "jolly" self. They considered that defendant did not want them to have any private contact with decedent, who once said she could not visit with others without some of Gladys' folks interfering.

### Confidential Relationship

 We conclude against defendant on Point I of her brief. The evidence was sufficient to show that defendant was in a confidential relationship with Alta. Such relationship, however difficult to define, includes one where a person relies on another to the extent Alta did. She gave Gladys and Hiram her general power of attorney in 1961. So far as the evidence shows, she never revoked it. The power of attorney is a significant factor. Flynn v. Union National Bank of Springfield, 378 S.W.2d 1, 12 (Mo.App.1964). Also, defendant collected on the notes and deposited the money, and customarily took Alta to the bank and finally to her attorney when the will was radically changed. It may be inferred from the evidence that Gladys counseled with Alta in regard to her financial affairs. A confidential relationship exists when one thus relies upon and trusts another in regard to handling property and business affairs, thereby creating some fiduciary obligation. Metter v. Janssen, 498 S.W.2d 581, 585 [10] (Mo.App.1973).

By October 1962 Alta had become physically and mentally debilitated to the point that she got lost in familiar surroundings. From then until her death, except for the three months she was at plaintiff's and short periods with her niece, she was at defendant's residence and almost entirely

dependent on defendant to take her to town for her business affairs and see to her day-to-day needs. Alta thought that Gladys and Hiram, relatives who had assumed her complete custody, had the authority to have the officials come and get her. When she wanted to buy the 20 acre tract of land, she heeded Gladys and Hiram, who, she said, would not let her buy it. By May 1962 defendant's daughter and her husband had bought Alta's large farm and padlocked it. Alta then was in the position of having to be at Gladys' home, at least at nights. Unable to care for herself, decedent found herself in the position of relying on Gladys to take care of her. The factors we note on this issue had probative value and were sufficient to show that Alta relied on Gladys in regard to handling of property and business matters and did create a fiduciary relationship. Compare Davis v. Pitti, 472 S.W.2d 382, 387 [4, 5] (Mo.1971); Steller v. Steller, 401 S. W.2d 473, 478 [5–7] (Mo.1966) (bodily custody generally "highly material").

■ While help with Alta's physical needs may not be sufficient alone to show a confidential relationship, it is highly material because it would incline Alta to be subservient (Steller v. Steller, supra at 478, noting the "usual deteriorating effects of arteriosclerosis", which Alta had as early as 1962), as would her mental condition, which was at least bordering on senility by 1962 when she was nearly 80 years old. Steller v. Steller, supra at 479.

### Exercise of Undue Influence

■ Defendant mentions in her brief, and we agree, that in addition to a confidential relation there must be evidence from which it may be inferred that the fiduciary-beneficiary was in some way active in procuring the transfer. Martin v. Norton, 497 S.W.2d 164, 168 [7] (Mo. 1973); Davis v. Pitti, supra 472 S.W.2d at 388; Wilhoit v. Fite, 341 S.W.2d 806, 814 [7] (Mo.1960); Michaelson v. Wolf, 364 Mo. 356, 370–371, 261 S.W.2d 918, 925 [13] (1953); Flynn v. Union National Bank of Springfield, supra 378 S.W.2d at 10. Defendant notes that the trial judge made no finding as to decedent's competence or that defendant had in any way actively caused or assisted in causing the transfers. Defendant's stated position is that there is "not one shred of evidence" from which it may be found or inferred that defendant was in any way active in procuring the transfers. For this purpose, defendant seems to assume that the trial court considered and found for plaintiff on this issue. We also indulge such assumption. Rule 73.01(b), V.A.M.R.

■■ The exercise of undue influence is usually shown by circumstantial evidence —that is, facts and circumstances from which it may be reasonably inferred that the fiduciary was active in some way which caused or assisted in causing the execution of the instrument. Hesse v. Wagner, 475 S.W.2d 55, 58 [1] (Mo.1971); Wilhoit v. Fite, supra 341 S.W.2d at 813; Michaelson v. Wolf, supra 364 Mo. at 370–371, 261 S.W.2d at 925; Metter v. Janssen, supra 498 S.W.2d at 584. Courts have adopted a liberal attitude regarding the quantum of evidence necessary to establish that the fiduciary was actively concerned in some way which caused or contributed to cause the execution of the instrument. Pasternak v. Mashak, 392 S. W.2d 631, 637 (Mo.App.1965) (execution of a will). While mere presence or opportunity to influence or a suspicion of undue influence is not sufficient, Steller v. Steller, supra 401 S.W.2d at 477; Walton v. Van Camp, 283 S.W.2d 493, 501–502 (Mo.1955); Michaelson v. Wolf, supra, 364 Mo. at 371, 261 S.W.2d at 925–926, and the undue influence must operate at the time to invalidate a transaction, the presence of the beneficiary or even the exertion of his influence at the exact moment of execution need not be shown. Simmons v. Inman, 471 S.W.2d 203, 207 (Mo.1971); Steller v. Steller, supra 401 S.W.2d at 473–478.

■ Of probative value on this issue are the facts (inferable from the evidence) that Gladys was present when Alta "signed" the notes over to her and when the certificates of deposit were cashed and purchased and the checking account

changed; the said transfers were an unnatural disposition (Alta had voiced her desire and intent that her estate go to her blood heirs); Alta was aged, ill physically, and of declining mental vigor; and Gladys concealed the transactions and her claim of gift and the new will. Steller v. Steller, supra at 479; Wilhoit v. Fite, supra 341 S.W.2d at 806; Michaelson v. Wolf, supra, 364 Mo. at 372, 261 S.W.2d at 926; Metter v. Janssen, supra 498 S.W.2d at 584. See also Simmons v. Inman, supra 471 S.W.2d at 206–207, recognizing the following factors, present here, which are relevant in determining whether undue influence has been exercised, e. g. Gladys' power and opportunity to influence and a sudden change from a former will. The evidence of Alta's being strong-willed and not easily influenced was for the trial court to weigh along with the above factors. Compare Wilhoit v. Fite, supra, 341 S.W.2d at 817.

The judgment is affirmed.

TITUS, C. J., and STONE, HOGAN and BILLINGS, JJ., concur.