MAI, XCVII (3d Ed.1981).

In re ESTATE OF Opal Mae
NEWSUM.

Mae ROBINSON, Petitioner–Appellant,

v.

Carol BRAKEBILL,
Respondent–Respondent.

No. 16456.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 13, 1990.

Motion for Rehearing or to Transfer
Denied Oct. 9, 1990.

Devon F. Sherwood, Springfield, for petitioner-appellant.

Elizabeth Rohrs, Bolivar, for respondent-respondent.

FLANIGAN, Chief Judge.

This is a proceeding for discovery of assets, § 473.340,[1] instituted by a verified petition filed in the Probate Division of the Circuit Court of Polk County by Mae Robinson, personal representative of the Estate of Opal Mae Newsum ("Opal"), deceased. Defendant is Carol Brakebill ("Carol").

The petition sought an order requiring Carol to deliver four items to the petitioner as assets of Opal's estate. In the alternative, petitioner requested judgment against Carol for all sums represented by the four items.

The four items in dispute were two bank accounts ("the NOW account") and ("the FM account") in the Polk County Bank at Bolivar, and two certificates of deposit ("the CD's") issued by that bank.

The petition alleged: The NOW account, which was held jointly by Opal and Carol, was created in July 1983 merely for the convenience of Opal for use in payment of Opal's bills; it was created as a joint account as a result of Carol's undue influence over Opal; on March 22, 1988, as a result of Carol's undue influence, Opal created the FM account as a joint account between Carol and Opal; on May 31, 1988, the CD's, each of which was titled in the name of Opal, were cashed by Carol when Opal was semi-comatose and lacked sufficient mental capacity to transact business; Carol placed the proceeds of the CD's in the NOW account and later converted the NOW account and the FM account to her own use; in July 1988 a guardianship was opened for Opal; prior to the guardianship proceeding, Opal had been ill and infirm and suffered from confusion, dizziness and loss of memory; also prior to the guardianship proceeding, Carol had gained the confidence and trust of Opal and Carol had acted in a fiduciary relationship in advising Opal with respect to Opal's financial affairs; on August 15, 1988, Opal died at the age of 83.

Carol's answer to the petition consisted essentially of a general denial.

Following an extended evidentiary hearing, the trial court, in a meticulous memorandum, made findings of fact, found the issues in favor of Carol and entered judgment denying the petition. The court found, among other things: the NOW account and the FM account were "both valid joint accounts"; Carol, as the surviving joint tenant, was entitled to the proceeds thereof, including the two CD's which were deposited into the NOW account on May 31, 1988.

The trial court also found the facts set forth in the following five paragraphs.

Opal was a retired school teacher and a widow who lived alone in Bolivar until her hospitalization on May 15, 1988. She was active and independent. She had a loving and close relationship with her niece Carol. Carol was very devoted to Opal. From the time she was a child, Carol spent a considerable amount of time in Opal's home. For the last 15 years of Opal's life, Carol talked to Opal or saw her every day.

Opal was the baby sitter for each of Carol's children and had the children in her home often as they grew older. Opal referred to Carol and her children as "my family."

1. All references to statutes are to RSMo 1986, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.

Carol ran errands for Opal and answered questions Opal had with respect to her bills or prospective purchases. Carol and Opal often went on shopping trips together. During Opal's final illness in 1988, Carol was the family member whom the doctors consulted and was the one who made arrangements for Opal to be transferred from one facility to another.

Carol testified that Opal did not ask Carol's advice with respect to Opal's banking affairs or the titling of her accounts or CD's. This testimony was confirmed by testimony from several bank employees, including Faye Barham and Kay Nichols who testified they waited on Opal when she had banking business and that Opal never appeared to be confused or indecisive. From July 1983 until May 15, 1988, when she was admitted to the hospital, Opal was in good health and quite active. Opal had many friends with whom she visited often. They stated that Opal never appeared to be disoriented or confused and was in fact friendly and talkative on each occasion. Opal was always neat and well groomed. Opal was active in a sorority and the retired teachers association. Opal taught as a substitute teacher until 1980. Opal did most of her own shopping and kept her house and prepared her meals. Opal drove her car to Walmart on a shopping trip the week before her hospitalization on May 15, 1988.

Opal was independent and self-sufficient and made her own decisions. While Opal may have often sought advice from others, including Carol, the ultimate decisions were her own. No undue influence was exercised by Carol over Opal. "The court does not believe that Carol's will was substituted for Opal's will or that Opal was deprived of her own free choice at any time." Carol was the natural object of Opal's bounty. Opal had no checking accounts in her own name as of May 28, 1988, and for some time prior thereto the only accounts Opal had were joint accounts with Carol, the NOW account and the FM account.

Petitioner appeals.

In general, petitioner contends that the judgment is against the weight of the evidence and is a misapplication of the law because Carol, on the respective dates when the NOW account and the FM account were created and the two CD's were cashed, occupied a fiduciary or confidential relationship with Opal, the accounts were created for Opal's benefit in protecting her from confidence men and in paying her expenses, and the foregoing facts were shown by clear and convincing evidence. As a result of that showing, petitioner asserts that the trial court should have imposed a constructive trust on the funds represented by the bank accounts and the CD's, and erred in not doing so.

■ Appellate review of this nonjury case is governed by Rule 73.01(c) as construed in *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976). The judgment of the trial court will be sustained unless there is no substantial evidence to support it or it is against the weight of the evidence or it erroneously declares or applies the law. See *Hawkins v. Allison*, 764 S.W.2d 719, 727 (Mo.App.1989).

The following is the chronology of the significant events, together with a history of the NOW account, the FM account and the CD's, and some of the trial court's findings:

### 1983

July 9—Opal admitted to hospital for problems connected with irregular heartbeat.

July 11—NOW account opened by Opal.

### THE NOW ACCOUNT

On July 11, 1983, an existing account in Opal's name was changed to the NOW account, a joint account with right of survivorship, with the joint tenants being Opal and Carol.

Evelyn Holt, who is Opal's sister-in-law and Carol's mother,[2] testified that in 1983 Opal got sick and Holt took Opal to the

---

**2.** The argument portion of petitioner's brief makes no mention of Evelyn Holt or her rela-

tionship to Carol or any complicity between the two.

hospital in Bolivar. While in the hospital, Opal asked Holt to get a signature card from the Polk County Bank. Carol was in St. Joseph.[3] Opal wanted Carol's name on her checking account so Carol could pay her bills in the event that Opal became "sicker than she was at that time."

Evelyn Holt went to the bank, got the signature card, and took it to Opal at the hospital. Opal signed the card and marked an X in the box calling for the account to be a joint tenancy account. Carol "on the 11th or the next day, one or the other," signed the card which Opal had already signed.

In 1983 Carol wrote some checks on the account for payment of Opal's medicine, Opal's doctor bills, and Opal's hospital bill. After making those payments in 1983, Carol wrote no checks on the NOW account until on March 22, 1988, when the FM account was created at Opal's request.

On a check drawn by Carol on March 22, 1988, $19,076.99 was transferred from the NOW account to the newly created FM account. On May 31, 1988, the two CD's, totaling $11,981.75 (with accrued interest), were deposited in the NOW account. On August 17, 1988, after Opal's death, Carol withdrew the funds from the NOW account and it was closed.

All of the checks written by Carol on the NOW account during Opal's lifetime were for payment of Opal's bills, including bills for nursing home care and medical expenses incurred in 1988.

The trial court found that the NOW account was opened and the signature card was signed by Carol at the direction and request of Opal, and that Carol delivered the card to the bank at Opal's direction. The trial court also found that Carol had no other part "in arranging for the opening of the account or the type of account," and that "employees of the bank also confirmed this testimony."

July 15—Opal discharged from hospital.

### 1988

March 22—FM account opened.

3. St. Joseph is at least 180 miles from Bolivar.

### THE FM ACCOUNT

Faye Barham, a bank employee, testified that the FM account was opened March 22, 1988, with an initial deposit of $19,076.99 [from the NOW account]. This account was opened with a signature card signed by Opal and Carol who were named as joint tenants with right of survivorship. Withdrawals from this account required both signatures of Opal and Carol.

Kay Nichols, another bank employee, testified that she was the employee who opened the FM account and that, consistent with bank policy, she explained to Opal and Carol the survivorship aspects of the joint account. Carol was with Opal when the account was opened.

James Brakebill, Carol's husband, testified that in March of 1988 he heard Opal discuss the reason for the opening of the FM account. It was set up "for two signatures" because Opal was concerned that she might be tricked. Opal had read about people "coming through town and selling paint and roofing" and she knew they preyed on elderly people.

Carol testified that she was present when Kay Nichols explained to Opal the "implications of making this a joint with survivorship account." She said that Opal established "this two-signature account" because Opal had heard stories about people trying to trick elderly people. Mrs. Nichols wrote out the check effecting the transfer from the NOW account to the FM account and Carol, at the request of Opal, signed the check. Carol also testified that she went to the bank with Opal at Opal's request.

No checks were written on the FM account until August 17, 1988, after Opal's death, when Carol wrote a check for the proceeds and the account was closed.

The trial court found that the opening of the FM account was done at Opal's request and that actions taken by Carol in that connection were done in compliance with Opal's request.

May 15—Opal admitted to hospital "for evaluation of possible CVA." The final diagnosis was: "a subdural hematoma of the right temporal parietal area."

May 23—Opal discharged from hospital and transferred to nursing home.

May 28—Opal endorses the CD's at nursing home.

## THE CD'S

One CD was issued to "Opal Newsum" and the other was issued to "Opal M. Newsum." On Tuesday, May 31, 1988, each CD having been endorsed by Opal, with Opal's signature witnessed by Robert Johnson, Carol presented both CD's to the bank. The bank cashed them and the proceeds, totaling $11,981.75, were deposited in the NOW account by Carol.

Bank employee Faye Barham testified that on the preceding Saturday, May 28, Carol called her and asked about cashing the CD's. Barham told Carol that Opal's endorsement was necessary and Carol said Opal was able to endorse them. Barham said it would be better if Opal's signature was witnessed. Barham recognized Opal's signature on both CD's and Opal had endorsed them "Opal Newsum" and "Opal M. Newsum" respectively.

Carol testified that Opal improved each day Carol saw her at the hospital. "Opal always knew who I was and where she was. She was not confused. Opal told me 'I want you to cash those CD's and put them in this NOW account to pay my hospital bills.'"

Carol, who had been given access to Opal's safety deposit box in 1983, and again in March 1988, took the two CD's to the nursing home, where Opal endorsed them.

Carol testified: "Opal was not disoriented that day at all." Carol had telephoned Faye Barham at Opal's request. Robert Johnson and Norma Jean Robinson were present when Opal endorsed the CD's. Opal made the endorsements and said, "Is that good enough?" Opal also said, "Now we can pay those bills and buy cat food." Opal had a cat at home.

Carol also testified that she took the CD's to the bank on May 31, "first thing in the morning," the first business day after Opal had endorsed them, and that it was later on the 31st that Opal's condition "worsened."

Robert Johnson testified that he was present when Opal endorsed the CD's. Johnson signed the CD's as a witness to Opal's signature. He said: "Opal knew me when I came in. Opal appeared real good to me and looked real normal. She told me she was signing them because she was going to pay her bills."

Norma Robinson testified that she was present when Opal endorsed the CD's. She said that Opal started to sign one of them and said, "Is it Opal M. or Opal Mae," flipped it over and said, "Opal M.," and signed it that way. After signing them Opal said, "Now you can pay the bills and buy some cat food. That should buy quite a bit."

The trial court found that in March of 1988 Opal told Carol that in the event Opal should become ill, Opal wanted to use the CD's to pay for Opal's care. This request was reiterated by Opal to Carol during the May 1988 hospitalization and again after Opal was admitted to the nursing home. Carol delivered the CD's to Opal as requested, and Opal endorsed them. At this time Opal "was conscious, coherent and alert. She was sitting up at the time she endorsed the CD's and throughout the day."

The court also found that Opal's attending physician, during the May 1988 hospitalization, said it was possible for Opal to be alert and think clearly and that he had observed a remarkable improvement in Opal's condition since her admission. Opal had received no medication during the three days prior to signing the CD's.

Linda Harris, an employee of the nursing home, although not present when the CD's were endorsed by Opal, testified that Opal was alert and conversant on that day. Also on that day Opal took her meals in the dining hall with the other residents, was talkative, and recognized some of her for-

mer students who were employed at the nursing home.

The trial court found "Opal was alert and oriented and fully aware of her surroundings at the time she endorsed the two CD's." The court also found that Carol's actions in cashing the CD's and depositing the CD's in the NOW account were done at the request of Opal.

May 31—Carol presents endorsed CD's to Polk County Bank and deposits proceeds in NOW account.

June 1—Opal admitted to hospital.

June 9—Mae Robinson (later personal representative of Opal's estate) files petition seeking appointment of guardian for Opal.

June 15—Opal discharged from hospital and transferred to nursing home.

June 23—Carol and John Robinson "cross petition" for appointment of guardian for Opal.

July 9—Opal admitted to hospital.

July 14—Letters of guardianship issued to Carol [4] and John Robinson as co-guardians.

August 15—Opal died.

August 17—Carol withdraws all funds in NOW account and FM account. The withdrawals totaled $31,886.99.

August 29—Opal's will admitted to probate and Mae Robinson appointed personal representative.

November 4—Instant proceedings for discovery of assets filed.

■ Petitioner criticizes the finding of the trial court to the effect that although Carol and Opal had "a very close and loving relationship, such relationship did not rise to the level of a confidential or fiduciary relationship." In support of that finding, the trial court stated that Opal was "independent and self-sufficient and made her own decisions. While she may have often sought advice from others, including Carol, the ultimate decisions were her own."

This court agrees with petitioner that the record contains evidence upon which the trial court could properly have found that a confidential relationship did exist between Carol and Opal. Carol admitted that she talked with Opal about her "business practices" and that Opal took "extreme advice" from Carol and Carol's husband. Nevertheless, the trial court also found that even if a confidential relationship existed, "no undue influence was exercised by Carol on Opal and the court reaches this conclusion based upon the weight of the evidence as well as the credibility of the witnesses. The court does not believe that Carol's will was substituted for Opal's will or that Opal was deprived of her own free choice at any time." For the reasons which follow, this court agrees with that finding.

"A confidential relationship exists when one relies upon and trusts another in regard to the handling of property and business affairs, thus creating some fiduciary obligation." *Davis v. Pitti,* 472 S.W.2d 382, 387[5] (Mo.1971); *Estate of Brown v. Fulp,* 718 S.W.2d 588, 595[5] (Mo.App. 1986). A *breach* of a fiduciary or confidential relationship is itself a constructive fraud and no proof of actual fraud is necessary in order to establish a constructive trust in favor of the victim of the constructive fraud. *Pollock v. Brown,* 569 S.W.2d 724, 730 (Mo. banc 1978). In *Pollock* that breach consisted of a trustee's diversion of trust funds to his personal purpose.[5]

Petitioner's brief advances this argument: "Once a confidential relationship is shown to exist, questions of undue influence or even actual fraud melt away in the warm sunshine of constructive fraud or its equivalent.... A showing of undue influ-

---

4. Petitioner in this proceeding makes no claim that Carol, in her capacity as guardian, acted wrongly with respect to any of the four items in dispute.

5. In *Pollock v. Brown, supra,* the supreme court discusses a constructive trust and describes it as a device used by a court of equity to provide a remedy in cases of actual or constructive fraud to prevent unjust enrichment. In *Estate of Stanley,* 655 S.W.2d 88, 91 (Mo.App.1983), the court of appeals pointed out that a proceeding to discover assets, such as the instant proceeding, is an action at law.

ence is unnecessary to recovery." That argument is legally unsound.

"Even where the existence of a confidential relationship is found, all the recent cases hold that there must also be evidence of facts and circumstances tending to show undue influence before a presumption of undue influence arises." *Steller v. Steller*, 401 S.W.2d 473, 478[7] (Mo.1966). Similarly, in *Davis v. Pitti, supra,* 472 S.W.2d at 388, the court said: "[I]n addition to the confidential relationship there must be some evidence from which the Court can infer undue influence; if such a presumption arises, the defendant may rebut it; if there is no rebuttal the presumption is conclusive; if there is, the question becomes one of fact for resolution by the trial court."

Although *Davis* and *Steller* did not involve joint bank accounts, such accounts were involved in *Estate of Linck*, 645 S.W.2d 70 (Mo.App.1982), and *Obermoeller v. Speck,* 544 S.W.2d 21 (Mo.App.1976). In each of those cases, a claim was made that the surviving tenant of a joint bank account had exerted undue influence upon the co-tenant at the time the account was established with the funds of the latter. Citing *Obermoeller,* which itself had cited *Davis* and *Steller,* the court of appeals in *Linck, supra,* 645 S.W.2d at 75, said: "In order to establish a presumption of undue influence, plaintiff must show (1) a fiduciary relationship and (2) some additional evidence from which undue influence may be inferred."

The foregoing authorities demonstrate that petitioner is wrong in asserting that a showing of a confidential relationship between Carol and Opal was alone sufficient to entitle petitioner to judgment. It was incumbent upon petitioner to adduce evidence which would support an inference of undue influence before a rebuttable presumption of undue influence would arise.

Undue influence consists of "overpersuasion or coercion which substitutes the will of one person for the free will of the other." *Steller v. Steller, supra,* at 477. It is also defined as "that influence which, by force, coercion, or over-persuasion destroys

the free agency" of the benefactor. *Davis v. Pitti, supra,* at 387; *Estate of Brown v. Fulp, supra,* at 596.

Proof of undue influence may be made by circumstantial evidence. *Pasternak v. Mashak,* 392 S.W.2d 631, 637[6] (Mo.App. 1965). Once a presumption of undue influence arises, a prima facie case is made which does not disappear even when countervailing evidence is produced. *Simmons v. Inman,* 471 S.W.2d 203, 206[2] (Mo. 1971). Raising the presumption of undue influence presents an issue for the trier of fact as to whether undue influence was in fact exercised. *Davis v. Pitti, supra,* at 388; *Estate of Brown v. Fulp, supra,* at 596. On the issue of undue influence, Opal's mental and physical conditions were "highly material." *Davis v. Pitti, supra,* at 387.

In *Estate of Stanley,* 655 S.W.2d 88 (Mo. App.1983), an administrator, in a proceeding to discover assets of the decedent, was successful in showing that decedent's son exercised undue influence in inducing decedent to set up a joint account in which the decedent, the son and the son's wife, were joint owners. The court, at p. 90, pointed out that a confidential relation does not ipso facto prove undue influence and that a beneficence by a mother upon a devoted child prompted by natural affection is not regarded as a bestowal induced by undue influence. The court also said, at 655 S.W.2d at 90:

"Where, however, a party in a relation of trust to another, by *active conduct induces* that other to transfer property and thereby received a substantial benefit, an inference of undue influence arises and a jury issue is made out....

"The courts entertain an expansive view of what evidence suffices to show that the fiduciary *actively procured* a transfer to a personal benefit. Thus, proof that a beneficiary under a will— also in a relation of confidence with the testator—procured and paid the lawyer who drew the testament suffices to raise a presumption of undue influence for jury submission.... Also, *active procurement* will be inferred from the power of the fiduciary to influence the holder of the funds, the opportunity to do so,

and that the disposition of the property was a changed course of action." (Citing authorities; emphasis added.)

The instant record amply supports the finding of the trial court that no undue influence was exercised by Carol on Opal in the creation or handling of the NOW account and the FM account or in Opal's endorsement of the CD's and the deposit of those funds by Carol in the NOW account.

When Opal decided in 1983 to create the NOW account as a joint account between Opal and Carol, she did so by converting Opal's individual account into a joint account. This was sufficient to bring § 362.470, dealing with joint accounts in banks, into play. "[W]hen an individual account is converted to one involving joint tenants or two or more persons, it would not be improper to say that by transfer a 'new' deposit had been made to a 'new' account. Either event would make [§ 362.-470] controlling." *Matter of Estate of Parker*, 536 S.W.2d 25, 29[2] (Mo. banc 1976). When Opal made that decision and obtained the signature card, Carol was over 180 miles away. Carol later signed the signature card on the NOW account, but there is nothing sinister in that. The only checks written by Carol on the NOW account, other than the transfer of funds to the FM account, were in payment of Opal's bills. Indeed, although the NOW account existed from 1983 until Opal's death, for almost five years Carol wrote no checks at all on the NOW account.

When the FM account was created, it was Opal's decision, or so the trial court was entitled to and did find, to create it as a device to protect her from predatory salesmen. Checks on this account required the signatures of both Opal and Carol, but no such check was written during Opal's lifetime.

During 1988, the year of Opal's final illness, Carol resumed writing checks on the NOW account but they, too, were all directed to the payment of Opal's bills. The endorsement of the CD's by Opal, at a time when witnesses said she was capable of understanding what she was doing, was done for the purpose of placing those funds in the NOW account in anticipation of medi-cal and hospital expenses of Opal. In depositing the endorsed CD's in the NOW account, Carol was merely carrying out the instructions of Opal made in March of 1983 and reiterated in May.

Petitioner introduced into evidence the final settlement of Opal's guardians covering the period from June 7, 1988 to October 11, 1988. That settlement listed assets totaling $192,115.41, including 14 "joint CD's," each held in the name of Opal and at least one other person. There were nine such other persons. Those CD's varied in amounts from $1,418.50 to $9,620.08. Each was delivered by the guardians to the respective surviving joint tenant or tenants.

At no time during Opal's lifetime did Carol appropriate one cent from any of the four items in dispute to her own purposes. Carol, as a surviving joint tenant of the NOW account and the FM account, was entitled to cash those accounts, as she proceeded to do after Opal's death.

Although Carol was not Opal's child, she was her niece and the bonds of affection between them were of years' standing and great depth. In *Linck*, quoting from *Obermoeller*, the court said at 645 S.W.2d 76:

"It is preposterous to postulate a proposition wherein a favorite child of a parent could not obey the wishes and desires of that parent relative to the latter's disposition of his property without becoming suspect, or being called upon under threat of pernicious mischief and nefarious activity to advance a complete stranger to do the bidding of the father just in order to escape the accusations. This is not the law, nor should it be the law."

This court holds that the finding of the trial court that Carol exercised no undue influence upon Opal with respect to the four items in dispute is not against the weight of the evidence and indeed is fully supported by the evidence.

The judgment is affirmed.

MAUS and SHRUM, JJ., concur.