Richard **RUESTMAN**, Plaintiff–Respondent,

v.

Dorothy **RUESTMAN**, Personal Representative of the Estate of Walter F. Ruestman, Defendant–Appellant.

No. 25022.

Missouri Court of Appeals, Southern District, Division Two.

May 15, 2003.

Motion for Rehearing and Transfer to Supreme Court Denied June 6, 2003.

Application for Transfer Denied Aug. 26, 2003.

Randy R. Cowherd, Springfield, for appellant.

Ron Mitchell, Phillip D. Greathouse, Blanchard, Robertson, Mitchell & Carter, P.C., Joplin, for respondent.

NANCY STEFFEN RAHMEYER, Chief Judge.

Richard Ruestman ("Respondent"), as an individual, brought suits against his father's second wife, Dorothy Ruestman ("Appellant"), as personal representative of the Estate of Walter F. Ruestman.[1]

---

1. The captions of Respondent's petitions failed to name Appellant in her individual

The suits were denominated as a suit for the discovery of assets and a will contest action.[2] The suits were tried to the jury with the following verdict directors:

### INSTRUCTION NO. 9

Your verdict must be for plaintiff and against defendant if you believe:

First, defendant exerted undue influence upon Walter F. Ruestman, and,

Second, as a direct result of such undue influence, assets of the Walter F. Ruestman Trust and separate assets, real property, and personal property of Walter F. Ruestman contemplated by the antenuptial agreement were transferred into joint investment accounts, joint checking accounts, or joint tenancies, with rights of survivorship to defendant, and,

Third, as a direct result thereof, defendant received and has adversely withheld funds and property belonging to the Walter F. Ruestman Trust and/or separate property of Walter F. Ruestman contemplated by the antenuptial agreement.

. . . .

### INSTRUCTION NO. 16

Your verdict must be that the document in issue is not the last will and testament of Walter F. Ruestman if you believe that Walter F. Ruestman signed the document as a result of the undue influence of Dorothy Ruestman.

The jury found for Respondent on both the discovery of assets action and will contest claim. The jury found for Respondent in the amount of $1,200,000. The jury also awarded Respondent the following items: "grandfather clock; custom jewelry, specifically an opal ring and a ring-blue center surrounded by diamond; cedar chest; any personal items and jewelry; three handmade copper lamps; miscellaneous construction tools; Samuel Clemons books; bonds; gold coins; property on Illinois [Street] upon [Appellant's] death; and the wedding ring worn by [Appellant] upon [Appellant's] death." After remand by this court for the failure to have a final judgment,[3] the trial court entered a constructive trust on "the assets set out in the jury verdict in violation of the prenuptial contract" until such time as the assets were delivered to Respondent.

Appellant claims eight points of error including lack of subject matter jurisdiction, error in the submission of the verdict directors, error in entering judgment on the verdicts, error in the jury instructions, and error in entering a vague, ambiguous, and unenforceable judgment. While there may be merit to several of Appellant's points, we find the issue of whether Respondent made a submissible case of undue influence to be dispositive of all but the first point. We shall address the first point as it concerns the subject matter jurisdiction of the trial court and, consequently, the jurisdiction of this court.

---

capacity; however, this mistake in the caption did not prohibit the trial court from having jurisdiction to enter judgment against Appellant individually because the allegations in the body of the petition made it clear that Appellant was being sued as an individual. *See In re Estate of Dawes,* 891 S.W.2d 510, 517 (Mo. App. S.D.1994).

2. Respondent's discovery of assets petition was originally filed in the probate division of

the circuit court, and the will contest petition was filed in circuit court. The circuit judge heard both actions after the recusal of the probate judge. The jurisdiction of the circuit judge to hear this matter has not been challenged.

3. *See Ruestman v. Ruestman,* 69 S.W.3d 525 (Mo.App. S.D.2002).

Appellant is the surviving spouse of Walter F. Ruestman ("Walter"), who died on October 16, 1997. Respondent is the only child of Walter and Walter's first wife, Ruth Ruestman ("Ruth"). Ruth and Walter were married in 1930 and remained married until Ruth's death in January 1987.

During Walter and Ruth's marriage, Respondent and Walter operated Ruestman Construction Company ("the Company"). On December 24, 1985, prior to Ruth's death, Walter created the W.F. Ruestman Trust ("the Trust").[4] Walter was the settlor and a co-trustee along with Ruth and Respondent. The Trust provided that Walter would receive the net income from the Trust "in convenient installments but at least semi-annually, during his life." The Trust also provided that the co-trustees were authorized to pay to Walter, as the settlor, out of any part or all of the Trust "for his care, support, maintenance, education or general welfare" at their absolute discretion. If Ruth failed to survive Walter, the remainder of the Trust was to be paid to Respondent or to Respondent's descendents if Respondent failed to survive. Any changes to the Trust could be made only after written notice was filed with the co-trustees. Walter and Ruth put all of their assets in the Trust including 1,019 shares of the Company's stock and their house at 2321 Illinois Street in Joplin, Missouri ("the House").

Walter and Appellant met in April or May 1987. The two dated about twice a week for almost a year, and Walter pro-posed marriage to Appellant in March 1988. Walter presented Appellant with an engagement ring on July 1, 1988. The ring was specially made for Appellant from a diamond taken from Ruth's wedding ring. In anticipation of the upcoming marriage, Walter had a warranty deed to the House prepared on July 5, 1988.[5] Walter and Respondent, as co-trustees of the Trust, conveyed title to the property to Walter and Appellant, as husband and wife. The deed did not include any language that would restrict Appellant's rights to the House. The deed to the House was filed on July 18, 1988.

On July 12, 1988, Appellant and Walter executed an "Antenuptial Agreement Between Walter F. Ruestman and Dorothy V. Hill." Appellant signed the agreement after consulting an attorney on June 15, 1988; however, the antenuptial agreement Appellant signed contained an extra paragraph that was not present when Appellant showed the agreement to her attorney. That provision stated: "Each of us waives the right to claim against the estate of the other by virtue of our marriage." There was no dispute that the agreement applied in the event of dissolution of the marriage; however, based on this provision Appellant and Respondent disputed whether the agreement applied in the event of death.[6]

The antenuptial agreement also provided that Appellant and Walter expected to make investments together during the marriage and that investments made together would be marital property except for the portion of separate property con-

---

4. The verdict director, verdict, and judgment refer to the Trust as the Walter F. Ruestman Trust; however, the correct name of the Trust is the W.F. Ruestman Trust Agreement.

5. That property was the "property on Illinois" that was awarded to Respondent and to be delivered to Respondent upon Appellant's death.

6. Due to our disposition of the remaining points on appeal, we do not address the issue of whether the antenuptial agreement was valid and enforceable or whether it was appropriate for the jury to interpret it.

tributed by each. The agreement was to be amended only in a writing that was signed and acknowledged by both parties before a notary public.

Walter listed the following as his assets:

### ASSETS HELD PERSONALLY BY WALTER F. RUESTMAN

| 1 | 1987 Bonneville | 8,500.00 |
|---|---|---|
| 1 | 1976 Ford Pickup | 1,200.00 |
| 5000 | Oz. Silver Bullion | 39,369.00 |
| 500 | California Gold Common Stocks | 860.00 |
| 800 | Sunshine Mining Co. | 3,200.00 |
| 200 | Helca Mining Co. | 2,800.00 |
| 1191 | Placer Dome, Inc. | 16,674.00 |
| 3000 | Galactic Resources | 21,000.00 |
| | Commerce Bank Brokerage Account | 33,011.00 |
| | Emmett A. Larkin Account | 3,395.00 |
| 400 | Shares Texas Utilities | 11,300.00 |
| 25 | Ounce Rands @ 450.00 | 11,250.00 |
| | Remaining Balance in I.R.A. | 21,358.00 |
| 1 | Mans Ring | 1,200.00 |
| | Cash in Bank | 43,600.00 |
| 2 | Lots on West 14th | 4,000.00 |
| | Texas Property | 21,000.00 |
| | | 243,719.00 [7] |

### ASSETS IN W.F. RUESTMAN & R.A. RUESTMAN TRUST [8]

| 1876 | Shares corporate Stock of Ruestman Construction Company | 180,091.00 |
|---|---|---|
| 1651/1621 | Conn. Duplex | 75,000.00 |
| 1521/1523 | Conn. Duplex | 60,000.00 |
| 201/203 | Turk Duplex | 60,000.00 |
| | Securities Ed. D. Jones | 207,534.56 |
| | | 582,625.56 [9] |

Appellant and Walter were married on July 14, 1988. This was a second marriage for both as Appellant had a prior marriage of 42 years that produced three children ("the Hill family").

On December 27, 1988, Walter executed a new will. When Phillip J. Metz ("Metz"), a local attorney who witnessed the execution of the will, asked Walter why he was executing a new will, Walter stated that his affections for Appellant had grown and Walter "felt that he needed to make provision for [Appellant]." Appellant went to the attorney's office with Walter the day he signed the will; however, Appellant was not in the room at the time of the signing. The will was witnessed by the attorney who drafted the will, Robert W. Richart, and Metz. Robert Richart's legal secre-

7. Apparently there is a mathematical error in the calculation of Walter's assets as the correct amount is $243,717.00.

8. Respondent testified that Ruth was the settlor of another trust in which Walter and Respondent were co-trustees. Ruth's trust re-

portedly included two duplexes that Walter had listed as his in the antenuptial agreement.

9. The House on Illinois Street and the specific items awarded by the jury to Respondent were not listed in the antenuptial agreement.

tary, Wilma I. O'Banion ("O'Banion"), notarized the will.

The will appointed Appellant as personal representative of Walter's estate and Respondent as personal representative if Appellant did not survive Walter. In the will, Walter made specific bequests of $20,000 to the First United Methodist Church, $10,000 to the Masonic Home of Missouri Western Unit, $5,000 to the Knights Templar Eye Foundation, and $2,000 to Joplin Hope Assembly Number 21 of the Order of Rainbow for Girls Scholarship Fund.[10] The remainder of Walter's estate was bequeathed to Appellant. If Appellant failed to survive Walter, Respondent was to receive the remainder of the estate.

During the marriage, Walter was a Masonic Past Grand Commander for the State of Missouri. As a Mason, Walter instructed new members on the "step work" orally because such steps were to be performed by memory. Walter was also a "Ritualist," which is a Mason who works solely from memory. As a Ritualist, Walter would often give very long oral lectures and perform rituals from memory. Walter was a member of an honorary group of Masons called the Red Cross of Constantine, which is a group of Masons who have distinguished themselves through their service.

Walter's friends testified that he was "strong-willed." Marvin Walter Frost ("Frost"), who knew Walter through the Masons, testified that Walter was the head of one body of the Masonry for the State of Missouri and was an excellent Ritualist. Frost could not remember any incident in which Walter had difficulty with the Mason recitations or a time when Walter was not in complete control of his mental faculties. Warren Carr ("Carr"), who knew Walter as a Mason and through the

Knights Templar and York Rite bodies; testified that Walter attended lodge meetings until 1997. Carr stated that he never noticed any change in Walter's mental condition. Joe Watson ("Watson"), who was a friend of the Ruestman family and had known Walter for over thirty years, testified that he never noticed a lapse in Walter's mental faculties until Walter was on his deathbed. Numerous other friends testified that they never saw Walter experience any difficulties with his mental faculties until 1997.

Throughout their marriage, Walter and Appellant traveled frequently to destinations such as Mexico, the Caribbean, Canada, the northwest United States, the state of Illinois, and throughout the state of Missouri. The couple traveled between Joplin, Missouri and Harlingen, Texas, where they kept a mobile home ("the Texas property"), approximately four times a year during the winter. The couple took turns driving when making the 840–mile trip.

Walter was a sophisticated investor and conducted many financial transactions during his marriage to Appellant. Walter was well informed about the stock market and understood investments quite well. Walter read the Wall Street Journal, studied the stock market, and researched his investment decisions. All of the investment advisors Walter worked with testified that Walter made all of the decisions regarding his investments and that they never worked with Appellant until after Walter's death. Appellant rarely accompanied Walter on his visits to the investment offices.

During the marriage, Walter opened joint bank accounts with Appellant and also titled the Texas property jointly with Appellant. On September 30, 1988, Wal-

10. Respondent and Appellant stipulated before trial that regardless of the outcome of the litigation, both parties would honor these bequests made by Walter in his will.

ter opened a joint account with Appellant at Edward D. Jones & Company ("Edward Jones") with a deposit of $18,000. That money did not come directly from the Trust account; however, Walter engaged in numerous transactions in the Trust accounts. In 1987, prior to his second marriage, Walter had opened an investment account for the Trust at Edward Jones. The original balance was between $80,000 and $90,000. On July 31, 1989, Walter made his first withdrawal from the Trust account at Edward Jones when he wrote a check for $50,000. Walter made deposits to and withdrawals from the Trust account at Edward Jones until August 1996. There were no direct transfers between the Trust account at Edward Jones and the joint account at Edward Jones. At Walter's death, the balance of the Trust account at Edward Jones was $46,942.04. These funds were delivered to Respondent as beneficiary of the Trust at Walter's death.

On March 31, 1993, Walter opened a second investment account at Raymond James & Associates, Inc. ("Raymond James") for the Trust; he deposited $24,950 in the account from a joint account Walter shared with Appellant. Walter continued to make deposits into this account and at his death the account was worth $305,000. Walter never withdrew any funds from this investment account, and Respondent received those funds as beneficiary of the Trust.

Respondent's claim concerning undue influence is primarily based on Walter's physical ailments. Walter was eighty years old at the time of the wedding. Just prior to proposing to Appellant in March 1988, he had been examined at the Mayo Clinic. He had numerous physical ailments including: cardiac arrhythmia, atrial fibrillation; valvular heart disease and mild calcific aortic stenosis; hypertensive heart disease with left ventricular hyper-trophy; massive peripheral edema, possibly secondary to congestive heart failure; multiple lipomas; congenital vascular nevus port wine stain; fungus on the toenails; gout; presbycusis; and multiple renal cysts. Walter told Appellant that he went to the Mayo Clinic before proposing because he wanted to know if he was "going to be all right," because if he was, he wanted to get married.

The only testimony of any mental incapacity during the marriage and prior to 1997 was of Walter's hyponatremia, which means low concentration of sodium in the blood, on September 27, 1988, and the diagnosis of "acute confusional state" on November 1, 1993, from which Walter immediately recovered. Walter's medical chart noted the following effects of the hyponatremia: "Recent change in coordination, slurring speech and change in mental status. Patient is a poor historian and somewhat altered in his mental state. Unclear thinking and unable to answer questions." Walter was discharged. No one claimed these symptoms persisted throughout the remainder of Walter's life.

Walter's doctor, Dr. James L. Compton, testified that there were times when Walter was lucid and times when Walter was not "quite so clear." Dr. Compton believed that Walter's mental state was impaired in December 1988 due to Walter's valvular heart disease, which according to Dr. Compton could affect mental status.

Walter experienced age-associated conditions such as heart problems, hypertension, and prostrate problems. On June 5, 1989, while Walter and Appellant were on a bus tour of the northwest United States and Canada, Walter had to be admitted to a hospital in Salt Lake City, Utah. Walter was diagnosed with a cerebral vascular accident involving the left parietal lobe, which in layman's terms is a stroke. Walter appeared to recover quickly and was

released from the hospital shortly after he was admitted. Again, there was no evidence of any lasting mental impairment.

When Walter's health deteriorated significantly in 1997, he slowed his involvement with his investments and the Company. In June 1997, Walter gave Respondent control of the Company. Walter also stopped making trades at Raymond James in June 1997 due to his illness. None of the transactions that are the subject of these suits occurred in 1997.

In August 1997, when Walter was admitted to the cardiac unit of the hospital, Dr. Compton informed Appellant, Respondent, and Respondent's family that Walter should no longer handle any business affairs. After a stay in the skilled unit of the hospital, Walter was released to his home with Appellant. On September 28, 1997, upon Respondent's request, Dr. Compton wrote a letter stating Walter was incapacitated.

Walter passed away on October 16, 1997 at the age of 89. On October 30, 1997, Respondent presented Appellant with two lists. The first list, which was titled "Items belonging to my mother Ruth H. Ruestman," included a grandfather clock, Ruth's wedding rings, a ring with an opal center surrounded by diamonds, a ring with a blue center surrounded by diamonds, a cedar chest, and "any personal items and jewelry." The second list was titled "Items of my fathers," and listed three handmade copper lamps, miscellaneous construction tools including a table saw and power tools, "Sam Clemons book," a pick-up truck, and "Items my father said

he wanted me to have," including "bonds: located in safe and or desk at home," and "gold coins: located in safe at home."[11]

Respondent testified that he received $46,000 in securities in the Trust account at Edward Jones and $273,000 in securities in the Trust account at Raymond Jones as well as all other property titled in the name of the Trust. Respondent's dispute is with property Walter titled jointly with Appellant and property Respondent claims was Walter's separate property that went to Appellant at Walter's death.

### Subject Matter Jurisdiction

In her first point relied on, Appellant contends the trial court erred in entering a money judgment for Respondent in his discovery of assets action because the court lacked subject matter jurisdiction in that a discovery of assets action is a probate proceeding to determine whether assets should be included in a probate estate. The jury found that "property of [the Trust] is being adversely withheld from [the Trust] by [Appellant]" and that the value of the assets withheld was $1,200,000.[12] The trial court ordered that Respondent have judgment over the Appellant "in the sum of $1,200,000.00 that [Appellant] adversely withheld from [the Trust]." Initially, we examine the statute in determining the trial court did not have subject matter jurisdiction to enter this portion of the judgment.

A discovery of assets proceeding under § 473.340 [13] is an action to determine a decedent estate's title, right to

---

11. The jury awarded the items on both lists to Respondent.

12. One of the points relied on challenges the calculation of the value of the funds determined to have been adversely withheld from the Trust. We do not reach the merits of that

point due to our conclusion that the trial court did not have subject matter jurisdiction to enter a money judgment regarding funds adversely withheld from a trust.

13. All references to statutes are to RSMo 2000, unless otherwise indicated.

possession, or both, to specific property.[14] *Estate of Williams v. Williams*, 12 S.W.3d 302, 305 (Mo. banc 2000). "It is a statutory proceeding similar to common law actions of trover or conversion, and its purpose is to determine whether the decedent held title at his or her death to certain described property and that the property is being adversely withheld by another person." *Robertson v. Robertson*, 15 S.W.3d 407, 420 (Mo.App. S.D.2000). A discovery of assets proceeding is not to be used as a device to test general fiduciary conduct, improper administration of the estate, or general disputes among heirs. *Ryan v. Spiegelhalter*, 64 S.W.3d 302, 305 (Mo. banc 2002).

Appellant's first point has merit. Respondent brought this action in his individual capacity. Respondent did not file his discovery of assets petition as the personal representative of the Estate of Walter F. Ruestman to bring assets into the estate or even as trustee of the Trust. Respondent may bring an action as an "interested party" in the Estate of Walter F. Ruestman pursuant to § 473.340; however, the action must be for the discovery of assets that should or should not be included in the estate. The petition and the jury verdict sought to place assets back into the Trust.

■ Respondent argues that the assets were wrongfully taken out of the Trust, placed into Walter's "estate" while Walter was living, and finally placed into joint bank accounts with Appellant. Respondent's circuitous argument has no merit. Just as there is no "marital property" except in a dissolution action,[15] there was no "estate" as contemplated by § 473.340 until Walter's death.[16] The property removed from the Trust could not have passed through Walter's estate during Walter's life.[17]

---

14. Section 473.340.1 provides:

Any personal representative, administrator, creditor, beneficiary or other person who claims an interest in property which is claimed to be an asset of an estate or which is claimed should be an asset of an estate may file a verified petition in the probate *division of the circuit court in which said* estate is pending seeking determination of the title, or right of possession thereto, or both. The petition shall describe the property, if known, shall allege the nature of the interest of the petitioner and that title or possession of the property, or both, are being adversely withheld or claimed. The court may order the joinder, as a party, of any person who may claim an interest in or who may have possession of any such property.

15. *See Sumners v. Service Vending Company, Inc.*, 102 S.W.3d 37 (Mo.App. S.D.2003).

16. Pursuant to § 472.010(11), when used in the probate code, "estate" means "the real and personal property of the decedent or ward, as from time to time changed in form by sale, reinvestment or otherwise, and augmented by any accretions and additions thereto and substitutions therefor, and diminished by any decreases and distributions therefrom[.]"

17. We recognize that Respondent may have had the right to bring an action for constructive fraud against Appellant for inducing Walter to take assets out of the Trust to the detriment of Respondent; however, the pleadings, the verdict director, and the verdict do not conform to that cause of action. More importantly, the element of "undue influence" would still be critical to this cause of action. As noted in the discussion of the remaining points, we find that there was not a submissible case to present to the jury the issue of undue influence.

Walter had an express trust, which can and did exist during Walter's life. An express trust is "a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it." *Masterson v. Plummer*, 343 S.W.2d 352, 355 (Mo.App.1961) (quoting Restatement (Second) of Trusts § 2 (1959)). Respondent

■ In his petition, Respondent claimed that Walter transferred ownership of both his real and personal property to Appellant while under Appellant's undue influence. The verdict director for the discovery of assets claim provides that the verdict must be for Respondent if, as a direct result of Appellant's undue influence, Walter transferred both "assets of [the Trust] and separate assets, real property, and personal property of Walter F. Ruestman." Respondent claims that the pleadings for his discovery of assets action were amended by Appellant's consent to include an equitable action to recover assets taken from the Trust. Even if the pleadings were amended by Appellant's consent, the pleadings would still not allow for a judgment regarding assets of the Trust because Respondent claimed the assets individually, not as trustee of the trust. "The powers of a court of equity, though broad, are limited to the claim for relief and issues made by the pleadings." *In the Matter of Heisserer*, 797 S.W.2d 864, 873 (Mo.App. S.D.1990).

We cannot read into § 473.340 a new cause of action to determine whether assets which have been adversely transferred from the Trust by the trustee to a proper beneficiary should be awarded to a subsequent beneficiary of the trust. The statute only allows filing a discovery of assets petition to determine whether assets should or should not be included in the estate, not to determine whether assets should or should not be in a trust.

■ Respondent argues that Appellant waived any claim as to jurisdiction because Appellant did not object to the jurisdiction of the trial court during the proceedings. The jurisdiction of the trial court is a question of law and is to be reviewed *de novo* by the appellate court. *Ryan ex rel. Estate of Reece v. Reece*, 31 S.W.3d 82, 86 (Mo.App. W.D.2000). An appellate court must inquire into the trial court's jurisdiction because appellate jurisdiction cannot be conferred by waiver, acquiescence, or even express consent. *In re Estate of Lloyd*, 676 S.W.2d 889, 890 (Mo. App. S.D.1984). "[I]f the trial court had no jurisdiction, this court has none." *Heisserer*, 797 S.W.2d at 868. We find that Appellant did not waive her right to raise the issue of the trial court's jurisdiction in her appeal.

■ The money judgment and the award of the House at Appellant's death [18] entered in Respondent's discovery of assets action are reversed and the court is ordered to enter judgment for Appellant on the claim for discovery of assets. When a judgment has been rendered without jurisdiction or authority, the judgment must be reversed regardless of the manner in which it is brought to the court's attention. *In Interest of E.S.*, 851 S.W.2d 676, 681–82 (Mo.App. W.D.1993). Respondent's use of the discovery of assets statute was a procedural ruse outside of the jurisdiction conferred by § 473.340; there-

brought this action in his individual capacity. The trustee is the legal owner of trust property. *McBee v. Gustaaf Vandecnocke Revocable Trust*, 986 S.W.2d 170, 172 (Mo. banc 1999). As such, the trustee is the proper party for actions affecting title to trust property. *Id. See also* § 456.480. Here, Respondent did not bring or plead his claim as trustee of the Trust and, therefore, did not have standing to pursue the action.

18. The deed to the House was transferred from the Trust to Walter and Appellant as husband and wife. If the deed is set aside in the discovery of assets action, the House would revert back into the Trust. As we have found the trial court did not have subject matter jurisdiction to enter a judgment bringing assets back into the Trust, the award of the House at Appellant's death must also be reversed.

fore, the judgments transferring property to Respondent must be reversed.[19]

### Undue Influence

■ We now address Appellant's fourth point relied on, as it is dispositive of Appellant's remaining points. In Appellant's fourth point relied on, she contends the trial court erred in entering judgment on Respondent's discovery of assets and will contest actions and overruling her motion for directed verdict and motion for judgment notwithstanding the verdict or in the alternative motion for new trial because Respondent failed to make submissible case of undue influence. We agree.

■ We treat an appeal from a trial court's denial of motions for directed verdict and judgment notwithstanding the verdict in the same manner; our primary inquiry is whether the plaintiff made a submissible case. *Vintila v. Drassen*, 52 S.W.3d 28, 38 (Mo.App. S.D.2001). In order for a case to be submitted to the jury, each and every fact essential to liability must be predicated upon legal and substantial evidence. *Giddens v. Kansas City Southern Ry. Co.*, 29 S.W.3d 813, 818 (Mo. banc 2000), *cert. denied*, 532 U.S. 990, 121 S.Ct. 1644, 149 L.Ed.2d 502 (2001). In determining whether the plaintiff made a submissible case, the appellate court views the evidence in the light most favorable to the jury's verdict and gives the plaintiff the benefit of all reasonable inferences and disregards evidence and inferences conflicting with the verdict. *Butts v. Express Personnel Services*, 73 S.W.3d 825, 835 (Mo.App. S.D.2002). "Our courts will not supply missing evidence or give a party the benefit of unreasonable speculative or forced inferences." *Schubiner v. Oppen-*

*heimer Industries, Inc.*, 675 S.W.2d 63, 78 (Mo.App. W.D.1984). This court may reverse the trial court's ruling only when there is a complete absence of probative facts to support the verdict. *Butts*, 73 S.W.3d at 835.

■ Respondent filed his will contest based upon allegations that Appellant exerted undue influence over Walter. Undue influence is "overpersuasion or coercion which substitutes the will of one person for the free will of the other." *Steller v. Steller*, 401 S.W.2d 473, 477 (Mo.1966). "The exercise of undue influence most often requires a case-by-case analysis and is usually proven by circumstantial evidence." *Estate of Gross v. Gross*, 840 S.W.2d 253, 257 (Mo.App. E.D.1992). In a will contest action, three elements give rise to the rebuttable presumption that the testator was unduly influenced by the beneficiary: (1) a confidential and fiduciary relationship between the testator and the beneficiary; (2) a substantial bequest to the beneficiary; and (3) an active role by the beneficiary in procuring execution of the will. *Hodges v. Hodges*, 692 S.W.2d 361, 376 (Mo.App. S.D.1985). "Raising the presumption of undue influence presents an issue for the trier of fact as to whether undue influence was in fact exercised." *In re Estate of Newsum*, 798 S.W.2d 165, 171 (Mo.App. S.D.1990).

■ The existence of the presumption is not required for a submissible case if circumstantial evidence is otherwise sufficient to permit an inference of undue influence. *Matthews v. Turner*, 581 S.W.2d 466, 472 (Mo.App. S.D.1979). The burden is on the plaintiff to prove undue influence. *Kaiser v. Pearl*, 670 S.W.2d

---

**19.** Appellant claims in another point relied on that the judgment on Respondent's claim for a constructive trust regarding the personal property and real property was vague, ambig- uous, and an unenforceable judgment. We do not address this issue in view of our finding that Respondent failed to make a submissible case of undue influence.

915, 918 (Mo.App. E.D.1984). "Motive and opportunity alone are not enough to establish undue influence." *Id.*

■ Walter's mental and physical condition is highly material on the issue of undue influence as it would indicate whether Walter was susceptible to undue influence by Appellant. *See Robertson,* 15 S.W.3d at 413. Factors considered in determining the existence of undue influence in the making of a will include:

> (1) an unnatural disposition, (2) an onset of solicitude of the [testator] by the proponent, (3) a change in predetermined testamentary intent, (4) unusual circumstances surrounding the execution of the will, (5) hostile feelings of the beneficiary toward the expected recipients, (6) remarks of the beneficiary to the [testator] derogatory of contestants, (7) the source of the [testator's] property being such as to make the disposition to the beneficiary unlikely, and (8) recitals of the will itself indicates undue influence.

*Kaiser,* 670 S.W.2d at 918.

■ A circumstantial case of undue influence is not made by establishing any one factor. *Id.* "The burden to prove undue influence rests upon the contestant, a burden that is met only by the presentation of substantial evidence." *Morse v. Volz,* 808 S.W.2d 424, 432 (Mo.App. W.D. 1991). Respondent failed to meet this burden.

■ The first prong for the presumption of undue influence is a fiduciary/confidential relationship. *Estate of Gross,* 840 S.W.2d at 257. In determining whether a confidential relationship exists for a finding of undue influence, the primary inquiry is whether or not trust is reposed with respect to the property or business affairs of the other. *Robertson,* 15 S.W.3d at 412. Although it has been said that a proper relationship between a husband and a wife is often a "fiduciary" or "confidential" relationship, something beyond this normal spousal relationship must exist before a "fiduciary" or "confidential" relationship can be found for the purposes of a claim of undue influence. *Hodges,* 692 S.W.2d at 376.

There was no evidence presented at trial indicating Appellant was Walter's fiduciary as required for a finding of undue influence. There was evidence that Appellant was Walter's primary caretaker when he became ill in 1997 and sometimes corrected Walter in the manner of his dress and the topics of his conversation in social settings; however, there was no evidence that Walter placed his trust in Appellant with regard to his property and business affairs.

There was no evidence indicating Walter ever consulted with Appellant with respect to his property or business affairs. In fact, it appears that the opposite is true. Evidence presented at trial indicated Appellant allowed Walter to manage all of their property, including her separate property. Several witnesses at trial, including Respondent's witnesses, testified that Walter had stated that he had been very successful in the stock market making Appellant and himself a great deal of money. According to Peter Ruestman ("Peter"), Respondent's son and Walter's grandson, Walter told him about how Walter increased the assets Appellant brought into the marriage. Walter helped Appellant sell her house when the couple decided to live in Walter's house at the time of the marriage.

Appellant also relied on Walter's advice prior to marrying him. Prior to the marriage, Appellant had been receiving $800 per month from her deceased husband's Army pension that she knew she would no longer receive if she remarried. Appellant expressed concern to Walter about losing

the monthly income, but Walter told her not to worry about it because he had enough for both of them to live on and so she agreed to marry him.

■■■ Respondent failed to present substantial evidence that Appellant was Walter's fiduciary; therefore, Respondent failed to raise the presumption of undue influence. "[T]he existence of a presumption is not essential to a submissible case if the circumstantial evidence is otherwise sufficient to permit a reasonable inference of undue influence." *Matthews*, 581 S.W.2d at 472. We now turn to Respondent's evidence to determine whether, absent the presumption, Respondent made a submissible case of undue influence.

Although there was considerable testimony regarding Walter's medical conditions, all of this testimony indicates that the effects of these illnesses on Walter's mental status were only episodic and there was no specific link between these episodes and the will. Dr. Compton testified that Walter had been diagnosed with numerous medical conditions during the eleven years that he had treated Walter, including heart problems and bouts of low sodium and low potassium. According to Dr. Compton, due to Walter's numerous health problems, there were times when "[Walter] was lucid and other times he wasn't quite so clear. Especially during the end of his life." Dr. Compton stated that although Walter's problems with his mental faculties were "episodic," he believed Walter was experiencing problems with his mental faculties due to his valvular heart disease in December 1988.

Despite believing that Walter's mental faculties were impaired in 1988, Dr. Compton testified that Walter was competent to make his own decisions in 1986, 1987 (except for intermittent low sodium), and 1989. Dr. Compton did not believe Walter's mental faculties to be so impaired as

to recommend the appointment of a guardian for Walter nor was Walter restricted in any activities including an 840–mile road trip to the Texas property four times per year. Dr. Compton did not put his belief that Walter was incapacitated in writing until he was requested to do so by Respondent on September 28, 1997.

Aside from Dr. Compton's testimony, the only testimony concerning Respondent's mental capacity came from Respondent's witnesses. Respondent's witnesses were Respondent, Respondent's wife, Respondent's children, Respondent's attorney, and Walter's brother. They testified that before and during Appellant and Walter's marriage, Walter was periodically very confused, but also periodically very clear. Peter testified that after Ruth's death, Walter began repeating things and his mind seemed to wander. According to Peter, these abnormalities started slowly, but grew progressively worse until Walter was delusional just before his death. Respondent testified that Walter was "in a state of confusion for quite some time" after the bouts with low sodium and low potassium; however, Respondent admitted that Walter's "state of confusion" did not last for nine years, the duration Walter and Appellant's marriage.

■■■ While Respondent presented evidence indicating that Walter was experiencing episodic problems with his mental faculties, Respondent's evidence did not indicate Walter was not aware of what he was doing or that he was the subject of undue influence at the time of the will. Most of Respondent's evidence regarding impairment of Walter's mental faculties involved the months just prior to Walter's death, which was long after Walter executed his will. Respondent did not present any evidence at trial that would indicate Walter's mental faculties were impaired at the time of the will.

Many of Walter's medical conditions are similar to the settlor of a trust in *Estate of Dean*, 967 S.W.2d 219 (Mo.App. W.D.1998). In that case the settlor had physical problems such as congestive heart failure, bronchitis, high blood pressure, lack of hearing, and poor eyesight. *Id.* at 222. The settlor was in the care of a nursing home and remained in the nursing home's care until her death. *Id.* The western district of this court affirmed the trial court's finding that these facts fell short of the required substantial proof of lack of testamentary capacity to revoke a trust as there was no evidence that the settlor had been diagnosed with a psychiatric or mentally disabling condition or that the settlor was taking any mind-altering medications. *Id.* at 222–23.

Likewise, in this case Respondent did not present any evidence other than medical conditions commonly experienced by the elderly. Furthermore, Respondent did not present any evidence that Walter had a psychiatric condition or a disabling mental illness, or that Walter was taking any mind-altering medications. Respondent would have been hard-pressed to make that argument because Walter made many transfers of funds into the Trust, increased the Trust's investment funds, and bought real estate from Respondent to help Respondent out of financial distress during the time period Respondent alleges Walter was under Appellant's undue influence.

Respondent's theory seems to be that Walter must have been confused because he transferred his property to his second wife. That theory is insufficient. As noted, although there was some evidence presented at trial indicating Walter experienced episodes of confusion, the majority of the witnesses testified that Walter was "strong-willed" and made his own decisions. These witnesses included investment advisors that worked with Walter's investment accounts. James Goodnight ("Goodnight"), an investment representative with Edward Jones, testified that Walter understood investments and knew the nature of stocks and bonds. Walter also knew the nature of a joint account and told Goodnight that "[h]e knew that if [Appellant] died first, the account would be his; if he died first, the account would then be [Appellant's]."

Edward Arnold ("Arnold"), the branch manager for Raymond James, testified that Walter "had his own mind about what he wanted to buy." According to Arnold, Walter "would come in two or three times a month, read the Wall Street Journal, bring in literature and decide which stocks he wanted to buy and sell, and so forth. So he made investment decisions like that." Donald J. Kelly ("Kelly"), who was an account executive at Marion Bass Securities where Walter and Appellant had a joint account, testified that Walter was a sophisticated and knowledgeable investor. According to Kelly, Appellant never purchased or sold securities by using his services and Walter never indicated that Appellant desired for him to buy or sell a given security.

An important consideration in determining whether undue influence has occurred is whether the disposition of the property was "unnatural." *Robertson*, 15 S.W.3d at 414. An "unnatural" disposition of property occurs when an individual transfers his property, without apparent reason, to non-blood heirs and excludes the natural objects of his bounty. *Id.* at 415. At a minimum, the natural objects of a person's bounty are those persons described in the statute on intestate succession.[20] *Needels v. Roberts*, 879 S.W.2d 550, 555 (Mo.App. W.D.1994). "The wife

20. *See* § 474.010.

of a testator, even the second wife, however, is also a natural object of his bounty, and the testator has the right to dispose of his property to her by will—even to the exclusion of the nearest relative." *Morse*, 808 S.W.2d at 432. Obviously, by this standard, Walter's disposition of his property to Appellant through his will was not an unnatural dispositions as Appellant was Walter's wife.[21]

We now turn to the next factor which is whether there was an onset of solicitude of the testator by the beneficiary. *Kaiser*, 670 S.W.2d at 918. Appellant and Walter were married before Walter executed the will; therefore, any onset of solicitude of the testator by the beneficiary would have been natural. Appellant's relationship with Walter was established long before the short time period which would support an inference of undue influence. "[T]he law does not ban as undue the natural influence of affection or attachment or the desire to gratify the wishes of one beloved or trusted by the [testator]." *Id.* at 919.

In considering whether a will is the product of undue influence, another factor is whether the will is a change in predetermined testamentary intent. Respondent argues that the fact that some of Walter's transfers to Appellant were contrary to Walter's original plan for the disposition of his property indicates Appellant unduly influenced Walter. Although Walter did dispose of his property in a manner that was inconsistent with his plan when Ruth was alive, none of the instances presented by Respondent raise an inference of undue influence.

For instance, Respondent and Respondent's wife, Marilyn Ruestman ("Marilyn"), claimed Walter had wanted Ruth's wedding rings to stay in the Ruestman family. Although Walter did not give Appellant Ruth's wedding ring, Walter gave Appellant an engagement ring and a wedding ring made from diamonds taken from Ruth's rings. When Marilyn asked Walter why he did not buy Appellant her own ring, he said "[w]ell, that's a really big diamond, and she would like to have it, and it would really cost a lot to replace that diamond today." According to Marilyn, Walter assumed the ring would be returned to the Ruestman family as an heirloom upon Appellant's death, but Marilyn did not testify to any statements by Walter that would indicate this was Walter's plan. Even Respondent admitted the ring was a gift.

Walter gave Appellant other rings that had originally belonged to Ruth for Appellant's birthday and Christmas. Evidence that Appellant wanted the diamond in Ruth's ring is hardly substantial evidence of active conduct of Appellant from which an inference of undue influence could arise. Although Ruth's wishes were conveyed to the jury on numerous occasions, the fact of the matter is that Walter decided how to dispose of the property that he had shared with Ruth.

As to the House, Marilyn testified that Walter told her that Appellant insisted that her name be placed on the deed to the House or she would not marry Walter. Walter and Respondent agreed to sign the warranty deed giving Walter and Appellant a tenancy by the entirety. Respondent and Walter had engaged in many real estate transactions and were very familiar

---

21. Respondent asked almost every witness if Walter would have wanted his property to go to the Hill family; however, the Hill family did not receive any of Walter's property. Walter's wife, Appellant, received the property through his will and by joint titling of assets by Walter.

with deeds; however, no language was included in the deed restricting Appellant's title to a life estate or otherwise to ensure that title to the House would revert to Respondent. Respondent testified that it was "understood" between the parties that Appellant was to have only a life estate in the House. "A suit to set aside a deed is an extraordinary proceeding in equity requiring that the evidence in support of that result must be clear, cogent and convincing." *Robertson*, 15 S.W.3d at 411. Appellant's desire to have her name placed on the deed to the home she shared with her husband is hardly substantial evidence of undue influence. To accept Respondent's argument, Appellant would have had to "unduly influenced" Respondent also. There is no evidence that Appellant substituted her will for that of Respondent.

■ As further testimony of a change in Walter's predetermined testamentary intent, Marilyn and Respondent testified that Walter had shown them stacks of unregistered bearer bonds and gold coins that were to go to Respondent and his family someday. Respondent admitted that the last time he saw the bearer bonds was two or three years prior to Walter's death. There was ample testimony that Walter traded bearer bonds on many occasions. There is no clear evidence that any bonds existed at the time of Walter's death; therefore, the fact that Respondent did not receive the bonds at Walter's death is not evidence of a change in Walter's predetermined testamentary intent.

■ Respondent further contended Walter wanted Respondent and his children to have the tools Walter kept in his garage. Pamela Duncan Kirsch ("Pamela"), Respondent's daughter and Walter's granddaughter, testified that on September 4, 1997, Walter told her that he wanted her to know that the tools in his garage were hers to "use" anytime she wanted;

however, Appellant told Pamela, while in Walter's presence, that she would need to ask permission before taking one of the tools. Apparently, Walter did not disagree with Appellant's statement. Again, there was nothing in the testimony regarding these instances indicating any active conduct by Appellant to prevent Walter from giving these items to Respondent and his family either prior to his death or at his death by way of an amendment to his will.

■ Upon being questioned as to whether Walter was under Appellant's undue influence during the times Walter transferred money from his joint account with Appellant to the Trust accounts, Respondent admitted that he did not know what days Walter was under Appellant's influence. Respondent stated: "All I know is that, the end result of the trust, and my dad transferred a lot of funds around to a lot of accounts. But the end result was that it was considerably smaller." This evidence was insufficient to show any undue influence by Appellant.

■ While there was evidence that Walter's will was a change in his predetermined testamentary intent, which was formulated when he was married to Ruth, there was nothing to indicate this change was due to Appellant's undue influence. A wife may properly influence her husband to make a will for her benefit so long as her influence is not exercised in an improper manner or by improper means and her influence does not cause the substitution of the will of the wife for the will of the husband. *Hodges*, 692 S.W.2d at 378–79.

■ Respondent argues that the fact that Walter and Appellant executed an antenuptial agreement prior to their marriage indicates Walter intended to keep his property separate and the change in his will reflects Appellant's undue influence.

Whether the antenuptial agreement applied only in the event of dissolution of the marriage or to both dissolution and death was disputed at trial, but it was clear that either party could transfer property to the other by gift. Walter understood joint tenancy and transferred property to himself and Appellant as joint tenants as permitted by the antenuptial agreement. This gifting is not necessarily a change in Walter's predetermined testamentary intent.

Metz, who witnessed the execution of Walter's will, testified that Walter had stated that his affections for Appellant had grown and "he felt that he needed to make provision for [Appellant]." Metz testified that he "got the impression that the longer they were married, [Walter's] affections grew, and he felt he should do something more for [Appellant]." Such affection and desire to provide for a spouse is part of a normal marriage; therefore, we are unable to infer undue influence from the fact that the disposition of Walter's property in the will was a change from Walter's predetermined testamentary intent.

There were no unusual circumstances surrounding the execution of the will. Respondent admitted he was not present when Walter first approached an attorney about making the will in question and did not see Walter on the day the will was signed; therefore, Respondent did not know of Walter's mental status on the day the will was executed. Appellant testified that she was with Walter when the will was drawn up and that she went to the attorney's office with Walter the day Walter executed the will; however, she was not in the room at the time of execution. Metz also testified that Appellant was not present when the will was executed and that Walter did not appear to be ill or confused. Metz testified that Walter appeared to be a "strong-willed" person and stated that he never noticed anything unusual about Walter's mental faculties. O'Banion, who notarized the will, testified that on the day Walter executed the will, he appeared to know exactly what he was doing and to be of sound mind.

There were no unusual circumstances surrounding the execution of the will, nor was there any evidence presented at trial indicating Appellant engaged in any active conduct to procure the will for her benefit. Furthermore, the assets received by Respondent as beneficiary of the Trust indicate that the change in Walter's will was not such that we could infer undue influence by Appellant. As beneficiary of the Trust, Respondent received assets valued at $420,916.26. Walter had also given Respondent the majority of the shares of the Company's stock and control over the Company prior to Walter's death. Although Respondent did not inherit under the will, Walter provided for Respondent upon his death through the Trust. At the time of the execution of the will, many of Walter's assets were in the Trust or in joint title with Appellant.

There was some testimony of "hostile feelings" between Appellant and Respondent. Marilyn testified that one of Appellant's "punch lines" was that Respondent was not going to be stealing from Walter anymore. According to Marilyn, after Walter became ill in 1997, Appellant said a lot of "mean," untrue things about Respondent. Respondent testified that during the three months prior to Walter's death, Respondent's relationship with Appellant "became quite strained." Appellant told Respondent that he was responsible for Walter's medical expenses because those expenses should be paid by the Trust and that he was to continue to pay Walter $2,000 per month as salary from the Company. Respondent testified that Appellant "poisoned" Walter's mind against Respondent. Although this evidence indicates

hostile feelings between the parties, none of this testimony concerned the time period in which the will was executed. Testimony regarding Appellant's comments about Respondent involved the time period just prior to Walter's death on October 16, 1997. The will was executed on December 27, 1988.

Finally, there is nothing in the recitals of the will indicating Walter had changed his desires concerning Respondent. Although the will named Appellant as the personal representative, Respondent was named as the successor personal representative. Respondent was also named the beneficiary of Walter's estate in the event Appellant predeceased Walter.

Respondent admitted that he had no facts or evidence that Appellant prevailed upon Walter to make the will. He relied on the lack of knowledge of what went on "behind closed doors" between Walter and Appellant to support an inference of undue influence. When asked if he had any facts or evidence that Walter did not understand or realize or appreciate the disposition of his property in the will, Respondent replied "I don't think he did understand." That supposition does not support a finding of undue influence.

We find *Morse v. Volz* to be instructive. In *Morse*, the plaintiff, who was the son of the testator and the testator's first wife, brought a will contest action on the grounds that the testator was not of sound mind at the execution of the will and that the will was the result of the undue influence of his father's second wife. 808 S.W.2d at 425. During the hospitalization of the testator's first wife, the testator began to drink heavily, often confining himself to his den with a bottle of scotch, and refused to visit his ailing wife. *Id.* at 426. The testator also became increasingly hostile toward others as he had struck his granddaughter, screamed and shouted

in fits, and was unreasonable with his neighbors. *Id.* When the testator's first wife died on December 31, 1978, the testator refused to make funeral arrangements, except to select the casket, and refused to attend either of the visitations. *Id.*

During the five years following his first wife's death, the testator became bitter, hateful, depressed, reclusive, resigned from clubs, refused to talk to old friends, and began to drink two fifths of scotch per week. *Id.* The testator began speaking frequently about being cheated out of money and experienced memory lapses in which he was unable to recall events of past weeks, days, or hours. *Id.* Other instances of the testator's uncharacteristic behavior included the testator throwing a newspaper in the face of his sister-in-law because she did not give him enough attention, changing clothes in front of his daughter-in-law in her family room, driving a car although he was unlicensed, working with power tools two inches from his nose, failing to recognize his son on numerous occasions, and prowling around his house at night with a .20 gauge shotgun after his house had been broken into. *Id.*

The testator began seeing the woman who would become his second wife within a few years of his first wife's death. *Id.* There was testimony that the testator's second wife dated another man at the same time she dated the testator and had said she would continue to date the other man until she got "a commitment or something" from the testator. *Id.* at 427. In 1984, despite the fact the plaintiff saw the testator two or three times a week, the plaintiff learned of the testator's impending marriage from his wife after she had a telephone conversation with the testator. *Id.* The testator reset the stones in his first wife's ring and gave the ring to his fiancée because the ring "was just laying

around gathering dust in the lock box." *Id.* The plaintiff sent a note to his future stepmother informing her that he did not approve of the impending marriage and that he had "nothing but contempt" for her, which led to the breakdown of the plaintiff's relationship with the testator. *Id.* at 427–28.

After the marriage ceremony, the testator and his second wife were transported by the two witnesses to the marriage to an attorney's office where the witnesses to the marriage also witnessed the execution of the testator's will; the second wife remained in the reception area. *Id.* at 428. The will left everything to the second wife if she survived the testator and to the children of the second wife if she predeceased him. *Id.* The will expressly stated that the testator left nothing to the plaintiff because "he does not have the need for what I may leave in my estate." *Id.*

The appellate court found that the plaintiff failed to make a submissible case of undue influence by the second wife because there was no substantial evidence that the second wife was the testator's fiduciary. *Id.* at 432. The court further found that the second wife's power and opportunity to unduly influence the testator was not enough to submit the issue to the jury absent active conduct by the second wife to procure the will for her benefit. *Id.* at 433.

The facts of *Morse* are far more persuasive for a finding of undue influence than the facts of this case. Respondent's evidence only showed that Appellant may have had the power and opportunity to unduly influence Walter by virtue of her marriage to him and "what goes on behind closed doors." Respondent did not present any evidence indicating Appellant seized the opportunity to influence Walter or that she engaged in active conduct to procure the will. When the facts of this case are compared to the facts in *Morse*, we conclude that this court cannot find that Respondent made a submissible case of undue influence in the will contest. If there was no undue influence in the procurement of the will, then Appellant was properly the beneficiary under the will and even if the personal property had been properly placed in Walter's estate through the discovery of assets claim, the property belongs to Appellant as beneficiary of the will. The only asset that does not pass through the will is the House as it was transferred by deed; however, even if Respondent were able to make a submissible case of undue influence, the House would be returned to the Trust. As we have already stated, the trial court did not have subject matter jurisdiction to enter judgment placing assets in the Trust.

 The evidence presented at trial by Respondent combined with the evidence presented by Appellant that favors Respondent, did not as a whole sustain the submission of undue influence to the jury in the will contest. There was no substantial evidence to support an inference that the will executed by Walter was the result of Appellant's undue influence. Even if Walter's personal property was not properly gifted to Appellant during Walter's lifetime, Appellant is entitled to the property as the beneficiary of the will. Point IV is granted.

### Constructive Trust

 Because the judgments regarding the discovery of assets action and will contest cannot stand, neither can the judgment in favor of Respondent in his claim for a constructive trust. In a constructive trust case, we will affirm the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law.

*Williams v. Walls,* 964 S.W.2d 839, 842 (Mo.App. S.D.1998). To establish a constructive trust, the evidence must be so clear, cogent, and convincing as to exclude every reasonable doubt in the mind of the trial court. *Id.* A court may impose a constructive trust where the defendant had undue influence over the grantor; however, as we have found that Respondent did not make a submissible case of undue influence, we also find that Respondent failed to present sufficient evidence of undue influence to support the trial court's judgment imposing the constructive trust. *See Estate of Davis,* 954 S.W.2d 374, 379 (Mo.App. E.D.1997).

The judgment is reversed; the trial court is directed to enter judgment in favor of Appellant.

PREWITT, P.J., and PARRISH, J., concur.